Disciplinary Counsel *v*. Tomlan.

[Cite as *Disciplinary Counsel v. Tomlan,*
118 Ohio St.3d 1, 2008-Ohio-1471.]

(No. 2007–1595—Submitted November 27, 2007—Decided April 3, 2008.)

**Per Curiam.**

{¶ 1} Respondent, John Richard Tomlan of St. Clairsville, Ohio, Attorney Registration No. 0007449, was admitted to the practice of law in Ohio in 1983.

{¶ 2} The Board of Commissioners on Grievances and Discipline recommends that we now indefinitely suspend respondent's license to practice based on findings that he (1) without her informed consent, transferred an elderly client's financial assets to joint and survivorship accounts in both of their names, (2) concealed estate proceeds in his possession after his client died, (3) unduly delayed performing his duties as executor of the client's estate, and (4) engaged in prohibited ex parte communication with a probate court judge. We adopt the board's findings that respondent violated the Code of Professional Responsibility and, over respondent's objections, accept the recommendation for an indefinite suspension.

{¶ 3} Relator, Disciplinary Counsel, charged respondent with multiple violations of the Disciplinary Rules, including DR 1–102(A)(4) (prohibiting conduct involving fraud, deceit, dishonesty, or misrepresentation), 1–102(A)(5) (prohibiting conduct that is prejudicial to the administration of justice), 1–102(A)(6) (prohibiting conduct that adversely reflects upon a lawyer's fitness to practice law), 5–101(A)(1) (prohibiting a lawyer, except with consent of a client after full disclosure, from accepting employment if the exercise of professional judgment on behalf of the client may be reasonably affected by the lawyer's financial and personal interests), 7–109(A) (prohibiting a lawyer from suppressing evidence that the lawyer has a legal obligation to reveal or produce), and 7–110(B) (prohibiting a lawyer from communicating ex parte on the merits of a case with the judge). Respondent answered relator's complaint, denying all wrongdoing

and asserting various legal defenses. A panel of the board heard the case, found the cited misconduct, and recommended a two-year suspension of respondent's license to practice. The board adopted the panel's findings of misconduct but modified the sanction, recommending an indefinite suspension.

Misconduct

*Respondent Violated DR 1–102(A)(6) and 5–101(A)(1) by Transferring His Client's Assets to Joint and Survivorship Accounts without the Client's Informed Consent*

{¶ 4} Respondent befriended Katherine Rice, a 90–year–old nursing home resident, shortly after her admission in 1993. Rice suffered from Parkinson's disease and, as early as July 1997, also showed signs of dementia or organic brain syndrome. Unmarried and childless, Rice possessed considerable wealth.

{¶ 5} Respondent began doing some legal work for Rice in 1997, when he handled a real estate closing for her and drafted a deed for the sale of a cabin. He then started helping Rice pay her bills, eventually having some mail directed to his home or office. In time, respondent also advocated on Rice's behalf, intermittently identifying himself as her legal counsel.

{¶ 6} Respondent prepared a will that Rice executed in May 1998. The will named respondent as executor and his wife as the alternate executor. Rice made these bequests in the will: $20,000 to Rice's nephew, $2,000 to her niece, $2,500 to be divided between two acquaintances, $25,000 to be divided among three churches, $2,000 to be divided between two fraternal organizations, $1,000 to be used for the perpetual care of Rice's cemetery plot, $1,000 to an alumni association, and the remainder of the estate to be divided among specified hospitals and philanthropic organizations.

{¶ 7} In spring 1999, Rice apparently told respondent that she wanted to revise her will to leave him a monetary bequest. Respondent properly advised his client that he could not ethically prepare a will that named him as a beneficiary and that she would have to hire another attorney. Rice apparently did not want another lawyer and never revised her will. Respondent never discussed the subject of independent counsel with Rice again.

{¶ 8} Respondent then began transferring Rice's assets, purportedly at her direction, into joint and survivorship accounts that they shared. In the first of three conveyances, respondent arranged in June 1999 for Rice to endorse four $100,000 checks with which he obtained four certificates of deposit in both of their names. He bought one certificate at the Belmont Savings Bank, a second at Wheeling National Bank, a third at Belmont National Bank, and a fourth at WesBanco Bank. These transactions ensured that title to the certificates of deposit would pass to respondent on Rice's death.

{¶ 9} In July 1999, Rice signed a healthcare power of attorney and a durable power of attorney. The first instrument named Rice's nephew as attorney-in-fact for healthcare decisions and respondent as first alternate attorney-in-fact. The durable power of attorney designated respondent as Rice's attorney-in-fact, conferring on him broad authority to buy and sell property, contract with financial institutions, buy and sell stocks and bonds, and transact business related to social security, pensions, IRAs, government benefits, insurance, credit cards, tax returns, and civil claims. Respondent used the durable power of attorney during Rice's lifetime to correspond with banks, creditors, and other entities about her legal affairs, and to open bank accounts, manage funds, and create and renew numerous certificates of deposit.

{¶ 10} Respondent facilitated a second conveyance of Rice's assets in June 2000. He arranged at that time for Rice to sign papers transferring 28,800 shares in stock she owned individually to him and herself jointly. This transfer, valued at approximately $1,000,000, also ensured that title of the stock would pass to respondent on Rice's death.

{¶ 11} In January 2002, Rice's treating physician recommended that Rice enter hospice care due to deteriorating health, and Rice's impaired decisionmaking capabilities prompted hospice staff to consult her healthcare fiduciary about admitting her. Respondent consented to Rice's admission to hospice care. To treat Rice's end-stage Parkinson's disease and other serious infirmities in the hospice facility, her doctor prescribed a variety of medications, including drugs for Parkinson's disease, dementia, and depression. A month after her admission to the hospice facility, respondent facilitated a third conveyance of Rice's property. He obtained a fifth certificate of deposit for $250,000 from Citizen's Bank with the proceeds from two of the previous certificates of deposit. After arranging for Rice to sign papers for the purchase, respondent placed the certificate of deposit jointly in his and Rice's name, again ensuring that title to the certificate would pass to him at Rice's death.

{¶ 12} In advising lawyers to eschew gifts from clients, and thereby avoid suggestions of undue influence and overreaching, EC 5–5 recommends that before accepting a gift, lawyers insist that munificent clients obtain independent counsel. Respondent did not prevail upon Rice to seek another lawyer. He instead single-handedly facilitated the purchase of four $100,000 certificates of deposit and the transfer of over $1,000,000 in stock with assets previously held individually by his elderly and debilitated client and placed the assets in joint accounts that would pass to him upon her death.

{¶ 13} Respondent does not deny now that he failed to obtain his client's valid consent to these gifts, which required him to disclose attendant risks such as the

tax consequences of the gifts and how the gifts might deplete her testamentary bequests. Respondent thereby violated DR 1–102(A)(6) and 5–101(A)(1).

*Respondent Violated DR 1–102(A)(4) and 7–109(A) by Concealing the Estate Proceeds in His Possession after His Client's Death*

{¶ 14} Rice died on December 25, 2002, at age 99. Respondent notified Rice's out-of-town niece of her death and arranged for the funeral. Though respondent had been appointed executor of Rice's estate and controlled all of Rice's primary assets by operation of the joint survivorship accounts, he took no action on behalf of her estate for over 16 months. During this time, respondent failed to (1) file Rice's will with the probate court, (2) file estate tax returns, (3) pay creditors, including the nursing and funeral homes, (4) terminate deductions for Rice's health-insurance premium from her checking account, and (5) deposit numerous interest and dividend checks as they became available.

{¶ 15} In December 2003, the nursing home hired attorney Thomas Semple to collect Rice's outstanding bill of approximately $11,500. At the end of that month, Semple applied to the Belmont County Probate Court for authority to administer Rice's estate. In February 2004, Semple discussed Rice's estate and the pending administration application with respondent. Respondent advised that he had Rice's will. Respondent also reported to Semple that Rice had no living relatives, which was not true.

{¶ 16} In March 2004, the probate court appointed Semple as administrator of Rice's estate. The day after his appointment, Semple sent respondent a letter requesting a list of Rice's assets, her will, and keys to her house. Respondent did not reply to this letter but did do something else. At the end of the month, respondent used $112,154.86 in proceeds from redeeming Rice's Belmont Savings Bank certificate of deposit to obtain a new certificate of deposit at WesBanco Bank in the name of his wife and himself.

{¶ 17} In April 2004, Semple moved the probate court for an order requiring respondent to produce Rice's will. Semple also filed a concealment action in that court, alleging that respondent had assets belonging to Rice's estate in his possession. Respondent, in turn, moved the probate court to appoint him as executor and discharge Semple as administrator. In his application to administer the estate, respondent estimated the value of assets in Rice's estate at $190,000, an amount that he would eventually concede was at least $200,000 too low.

{¶ 18} In June 2004, the probate court denied respondent's motion to discharge Semple as administrator of Rice's estate. The court also found that respondent was "not a suitable person to serve as executor" because of his delay in administrating the estate and the resulting detriment to the beneficiaries. The court cited respondent's failure to properly manage assets, settle estate bills, and

respond to Semple's numerous communications requesting information and documentation. The order denying Semple's discharge and respondent's appointment was affirmed on appeal.

{¶ 19} After the probate court's order, respondent continued to refuse to give Semple information concerning the Rice estate assets, ignoring Semple's further inquiries in July and August 2004. That August, respondent's wife applied for authority to administer the Rice estate and, notably, estimated the estate's value at $1,000,000. The probate court denied this application and, on its own motion, issued an order compelling respondent to produce all information and documentation pertaining to the estate.

{¶ 20} In November 2004, Semple sent respondent a set of interrogatories, specifically asking him to identify all assets that he had acquired from Rice. In his response, an unsworn statement, respondent identified three of four nonprobate assets that he held with Rice at her death, the three for which he had not exercised survivorship rights: the $100,000 WesBanco certificate of deposit, the stock, and the $250,000 Citizens Bank certificate of deposit. He did not identify a $100,000 check made payable to Rice or him from the Belmont Savings Bank, which he received from cashing in the joint certificate of deposit that he had obtained in June 1999, and which he used in March 2004 to obtain a new certificate of deposit for his wife and himself.

{¶ 21} In December 2004, Semple moved the probate court to enjoin respondent from accessing the nonprobate assets of the Rice estate. At a hearing on the motion in January 2005, respondent again disclosed just the three nonprobate assets previously identified. Though asked directly, respondent did not divulge in his testimony the check for the proceeds from the Belmont Savings Bank joint certificate of deposit. The probate court issued a preliminary injunction, restraining respondent as of February 1, 2005, from exercising any control over the three disclosed nonprobate assets.

{¶ 22} Also in December 2004, Semple filed an action in the Belmont County Common Pleas Court, alleging respondent's undue influence, breach of fiduciary duty, conversion, unjust enrichment, and negligence in overseeing Rice's affairs. Respondent retained attorney Stuart G. Parsell for his defense. At a May 20, 2005 pretrial, Parsell disclosed for the first time the former $100,000 Belmont Savings Bank joint certificate of deposit. In May 2005, the probate court signed an agreed entry restraining respondent from exercising any control over the proceeds from the previously undisclosed Belmont Savings Bank joint certificate of deposit.

{¶ 23} In August 2006, Semple dismissed the common pleas suit pursuant to the parties' agreement to settle the case.[1] Respondent agreed in the settlement

---

1. Provisions for confidentiality in the settlement agreement did not preclude disclosure of the terms to disciplinary authorities.

to return the stock, then valued at over $1.4 million, and the $250,000 Citizens Bank certificate of deposit, then valued at $276,951.41, to the Rice estate. The settlement terms allowed respondent to retain ownership of the Belmont Savings and WesBanco certificates of deposit and all interest accrued on those certificates, valued together at $222,944.75. The probate court found that the settlement agreement was in the best interest of the estate.

{¶ 24} On August 20, 2006, Semple filed an amended inventory in the Rice estate that, including the over $1,600,000 in assets returned by respondent, valued the estate at $2,158,931.93.

{¶ 25} Though asked in interrogatories to identify "any and all assets" that had once belonged to Rice and that presently belonged to him, respondent identified only three of the four under his control. He did not reveal the $100,000 Belmont Bank certificate of deposit that he conveyed, at a value of $112,154.86, to himself and his wife just eight months before Semple propounded the interrogatories. Several months later in probate court, respondent concealed the same evidence while testifying under oath.

{¶ 26} Respondent does not deny now that he failed to disclose evidence that he knew he had a duty to reveal. He thereby violated DR 1–102(A)(4) and 7–109(A).

*Respondent Violated DR 1–102(A)(5) and 1–102(A)(6) by Unduly Delaying the Performance of His Duties as Executor of His Client's Will*

{¶ 27} Respondent delayed admitting the Rice estate to probate for 16 months. He did not deposit numerous dividend and interest checks accruing from the stock and certificates of deposit during that time, depriving the estate and beneficiaries of the use of and interest on these funds. He then impeded the probate process by ignoring the court-appointed administrator's efforts to open the estate, necessitating a legal action to obtain Rice's will and identify concealed assets.

{¶ 28} Respondent's failure to turn over estate assets and pay creditors also led to the common pleas action, which in turn led to the recovery of assets held by respondent. By forcing Semple to sue, respondent substantially damaged his former client's estate by depleting the assets intended for residual beneficiaries. As a significant example, the contingent legal fee charged to obtain the disclosed and concealed assets cost the estate approximately $560,000 and reduced the residual estate by that amount. Respondent's delay also harmed beneficiaries and creditors of the estate simply by generating frustration and inconvenience.

{¶ 29} Respondent does not now deny that he unduly delayed in performing his duties as executor of the Rice estate. He thereby violated DR 1–102(A)(5) and 1–102(A)(6).

*Respondent Violated DR 7–110(B) by Engaging in Prohibited Ex Parte Communications with the Probate Judge*

{¶ 30} In mid-May 2004, Belmont County Probate Judge J. Mark Costine conducted a hearing on Semple's allegations of concealment. Shortly afterward, respondent spoke with Judge Costine as the judge was leaving the courthouse and asked the judge for his thoughts on the case. Respondent advised Judge Costine that he had been Rice's attorney and knew her personal affairs. Respondent also said that he hoped the judge would exercise his discretion to decide in respondent's favor.

{¶ 31} Respondent does not deny now that he spoke to Judge Costine about the merits of a pending adversarial proceeding without notice to opposing counsel and without legal justification. He thereby violated DR 7–110(B).

Sanction

{¶ 32} The board recommended that we indefinitely suspend respondent's license to practice, citing the scope of respondent's calculated misconduct and the actual harm suffered. Respondent objects and urges us to accept the panel's recommendation for a two-year suspension, arguing that neither self-dealing nor egregious injury exists in this case. We disagree and overrule the objections.

{¶ 33} In determining the appropriate sanction to impose for attorney misconduct, we consider the duties violated, the actual or potential injury caused, the attorney's mental state, the sanctions imposed in similar cases, and the existence of aggravating or mitigating circumstances. *Stark Cty. Bar Assn. v. Ake,* 111 Ohio St.3d 266, 2006-Ohio-5704, 855 N.E.2d 1206, ¶ 44. We weigh the aggravating and mitigating factors to determine whether circumstances warrant a more lenient or a more exacting disposition. See Section 10(B) of the Rules and Regulations Governing Procedure on Complaints and Hearings Before the Board of Commissioners on Grievances and Discipline ("BCGD Proc.Reg."). Because each disciplinary case involves unique facts and circumstances, BCGD Proc.Reg. 10(A), we are not limited to the factors specified in the rule and may take into account "all relevant factors" in determining which sanction to impose. BCGD Proc.Reg. 10(B).

A. Duties Violated, Mental State, and Injury Caused

{¶ 34} Respondent violated his duty to his client by (1) failing to insist that she obtain independent counsel, (2) facilitating transfers of her assets to himself by himself, and (3) saying virtually nothing of the ramifications to her estate. Respondent violated duties to the public and the judicial system by his undue delay in administering the Rice estate, concealment of estate assets in his

8

possession, and ex parte communication with Judge Costine. Respondent accepts the findings that he breached these duties.

{¶ 35} In his defense, however, respondent underscores that he was "like family" to Rice and genuinely believed that, given their long, close friendship and discussions about her affairs, the transfers to joint and survivorship accounts fulfilled her ambitions for her fortune. Though Rice experienced some intermittent diminished mental capacity, respondent also insists that she continued to function with purpose and decisiveness during her last years and, as a result, conveyed unblemished title when she signed all the papers necessary to complete the transfers. Respondent thus claims that he did not exercise undue influence or engage in overreaching, the evils that DR 5–101(A)(1) exists to prevent.

{¶ 36} "Elements of undue influence include 'a susceptible testator, another's opportunity to exert it, the fact of improper influence exerted or attempted, and the result showing the effect of such influence.'" *Krischbaum v. Dillon* (1991), 58 Ohio St.3d 58, 65–66, 567 N.E.2d 1291, quoting *West v. Henry* (1962), 173 Ohio St. 498, 501, 20 O.O.2d 119, 184 N.E.2d 200. Because all these elements are present when a lawyer receives a testamentary gift from a client unrelated by blood or marriage through a will that the lawyer prepared, a presumption of undue influence arises. Id. at paragraph one of the syllabus. The presumption, as well as the prohibition against a lawyer's receiving such gifts through a will or trust in DR 5–101(A)(2), serves to protect the high level of trust and confidence that the attorney-client relationship demands in fulfilling a client's testamentary wishes:

{¶ 37} "A client's dependence upon, and trust in, his attorney's skill, disinterested advice, and ethical conduct exceeds the trust and confidence found in most fiduciary relationships. Seldom is the client's dependence upon, and trust in, his attorney greater than when, contemplating his own mortality, he seeks the attorney's advice, guidance, and drafting skill in the preparation of a will to dispose of his estate after death. These consultations are often among the most private to take place between an attorney and his client. The client is dealing with his innermost thoughts and feelings, which he may not wish to share with his spouse, children and other next of kin.

{¶ 38} "Because the decisions that go into the preparation of a will are so inherently private, and because, by definition, the testator will not be available after his death, when the will is offered for probate, to correct any errors that the attorney may have made, whether they are negligent errors or of a more sinister kind, a client is unusually dependent upon his attorney's professional advice and skill when he consults the attorney to have a will drawn. The client will have no opportunity to protect himself from the attorney's negligent or infamous misconduct." *Krischbaum*, 58 Ohio St.3d at 62–63, 567 N.E.2d 1291.

{¶ 39} As the board observed, considerations underlying a presumption of undue influence equally apply to situations in which lawyers obtain an interest in client assets by preparing other instruments that transfer the interest in anticipation of the client's death. In *Disciplinary Counsel v. Galinas* (1996), 76 Ohio St.3d 87, 666 N.E.2d 1083, we suspended a lawyer from practice because he had prepared a will for an unrelated client that named the lawyer as a beneficiary and had also transferred client assets to himself through joint and survivorship accounts. Though we focused in that case mainly on the impropriety of giving such gifts through testamentary devise rather than through inter vivos transfers, we referred to the presumption of undue influence because the clients in both situations are contemplating their own mortality and thus are peculiarly susceptible to the influence of their counsel, citing *Krischbaum*, 58 Ohio St.3d at 62–63, 567 N.E.2d 1291. Accord *Disciplinary Counsel v. Kelleher*, 102 Ohio St.3d 105, 2004-Ohio-1802, 807 N.E.2d 310 (lawyer violated DR 5–101(A)(2) by drafting an inter vivos trust for an unrelated client that provided for distributions to the lawyer's family when the client died).

{¶ 40} Nursing staff corroborated that Rice and respondent had a longstanding relationship and that, for the most part, Rice remained strong-willed and lucid throughout. Strength of will and lucidity, however, are not characteristics on which we can rely to conclude that this 96–year–old nursing home patient with multiple debilitating infirmities, including signs of dementia or organic brain syndrome, was impervious to respondent's influence. To the contrary, with these obvious indicators of vulnerability, we doubt that Rice directed respondent's efforts, without any encouragement, to circumvent the numerous bequests to friends, family, and philanthropic groups that she had made in a will executed just one year before the transfer of assets to joint and survivorship accounts.

{¶ 41} We share the board's skepticism and suspect that respondent used the joint and survivorship accounts to accomplish what he knew he could not ethically do through a will. He then did not insist upon independent counsel because the interference could derail the transfer of Rice's considerable assets to him. Moreover, we infer from respondent's delay in administering the Rice estate that he fully realized the threat that admitting the estate to probate might expose undue influence and overreaching. We thus do not accept respondent's assertion that his misconduct was a mere technical violation of DR 5–101(A)(1).

{¶ 42} Respondent also urges us to weigh in his favor that he regrets having failed to disclose the proceeds from the $100,000 Belmont Savings Bank certificate of deposit, that he did so unintentionally, and that he afterward rectified the mistake by accounting for and preserving the assets in which Rice had an interest when she died. The harm respondent avoided with his disclosure, however, does

little to offset the rest of the damage done in this case. The cost of respondent's misconduct to the Rice estate, its beneficiaries, and creditors is indefensible.

### B. Sanctions Imposed in Similar Cases

{¶ 43} *Mahoning Cty. Bar Assn. v. Theofilos* (1988), 36 Ohio St.3d 43, 521 N.E.2d 797, signaled this court's growing impatience with lawyers profiting from client gifts given in anticipation of a client's demise. For preparing the offending will and joint and survivorship accounts from which he and his son received over $200,000, we suspended the lawyer in *Theofilos* from practice for one year. The lawyer in *Disciplinary Counsel v. Galinas* (1996), 76 Ohio St.3d 87, 666 N.E.2d 1083, took nearly $955,000 under the offending will and joint and survivorship accounts. Because he also attempted to collect $150,000 in excessive attorney fees for administering his client's uncomplicated estate, we suspended him indefinitely from the practice of law. Id. at 92, 666 N.E.2d 1083. We imposed this sanction, which requires the suspended lawyer to petition for reinstatement in and fulfill the standards in Gov.Bar R. V(10)(B), to ensure the public's protection.

{¶ 44} As relator argues, the scope of respondent's misconduct is much like that in *Disciplinary Counsel v. Slavens* (1992), 63 Ohio St.3d 162, 586 N.E.2d 92, in which a lawyer wrote a will for a client suffering from senility and organic brain syndrome, devising 35 percent of the client's $1,500,000 estate to himself and naming his children as beneficiaries. With a power of attorney, the lawyer further gave himself "gifts" of over $160,000 without disclosing the transfers to the client's accountant or filing any gift tax returns. After the client's death, the lawyer lied about the existence of predecessor wills and, when asked about the assets of the estate, did not disclose the inter vivos transfers. 63 Ohio St.3d at 163, 586 N.E.2d 92. For his violations of DR 1–102(A)(4), 1–102(A)(1) and (6) and 5–101(A), we ordered an indefinite suspension.

{¶ 45} Respondent cites cases similar to *Slavens* in which we have imposed sanctions less stringent than indefinite suspension. In *Kelleher*, 102 Ohio St.3d 105, 2004-Ohio-1802, 807 N.E.2d 310, for example, we suspended a lawyer from practice for one year, staying the last six months on conditions, because he drafted an inter vivos trust for an unrelated client and named the lawyer's spouse, children, and grandchildren as beneficiaries. In *Toledo Bar Assn. v. Cook*, 97 Ohio St.3d 225, 2002-Ohio-5787, 778 N.E.2d 40, another lawyer received a one-year suspension with a conditional stay of the last six months because she prepared a will for an unrelated testator that named her siblings' corporation as a beneficiary. In *Stark Cty. Bar Assn. v. Buttacavoli*, 96 Ohio St.3d 424, 2002-Ohio-4743, 775 N.E.2d 818, a lawyer failed to fully disclose to his clients his financial interest in the investment recommendations he made while acting as

their lawyer and as their financial planner and received a six-month suspension from practice, all stayed on conditions. And in *Cincinnati Bar Assn. v. Clark* (1994), 71 Ohio St.3d 145, 642 N.E.2d 611, we found a violation of DR 5–101(A) and suspended the lawyer for two years, staying the last year on conditions, because he both gave and loaned his client's money to himself and his family.

{¶ 46} None of these cases, however, involved a lawyer who realized the impropriety of giving himself gifts of a client's property through one form of conveyance and then turned to another form to accomplish the same result. This self-dealing recalls the "cost/benefit analysis" conducted by the lawyer in *Galinas,* who, when he chose to prepare the will in question, weighed the risks of violating DR 1–102(A)(6) and "the possibilities of being caught for the disciplinary infraction (and the range of possible sanctions) against the economic benefits to be derived" from the misconduct. 76 Ohio St.3d at 91, 666 N.E.2d 1083. We imposed the indefinite suspension in that case, in part to send a strong message that we will not tolerate such machinations from the legal profession.

C. Aggravating and Mitigating Factors

{¶ 47} Having found that an indefinite suspension of respondent's license is justified under the preceding tests, we examine the mitigating and aggravating factors to further tailor our disposition. Respondent has no prior disciplinary record and cooperated professionally in the disciplinary proceedings, which are mitigating factors under BCGD Proc.Reg. 10(B)(2)(a) and (d). He has also presented persuasive testimonials as to his character and reputation apart from the events at bar. See BCGD Proc.Reg. 10(B)(2)(e).

{¶ 48} These factors are outweighed, however, by the aggravating circumstances that respondent compromised his vulnerable client and her named beneficiaries to benefit his own financial interests and that he did so in a series of wrongful acts. See BCGD Proc.Reg. 10(B)(1)(b), (d), and (h). Moreover, though the board found mitigating that respondent had resolved the underlying dispute to the satisfaction of the estate administrator and the probate court, we cannot ignore that respondent profited from his wrongdoing. Therefore, although we do not order restitution, we find the fact of respondent's windfall to be an aggravating factor.

{¶ 49} For violations of DR 1–102(A)(4), 1–102(A)(5), 1–102(A)(6), 5–101(A)(1), 7–109(A), and 7–110(B), we hereby indefinitely suspend respondent from the practice of law in Ohio. Costs are taxed to respondent.

Judgment accordingly.

MOYER, C.J., and LUNDBERG STRATTON, O'DONNELL, and CUPP, JJ., concur.

12

PFEIFER, O'CONNOR, and LANZINGER, JJ., dissent and would permanently disbar the respondent.

_____

LUNDBERG STRATTON, J., concurring.

{¶ 50} I concur with the decision to indefinitely suspend the respondent from the practice of law. However, I would additionally require him to disgorge the proceeds that he was permitted to retain in the settlement with Thomas Semple in the Belmont County Common Pleas Court and return those funds to the estate.

{¶ 51} The majority acknowledges that respondent profited from his wrongdoing, yet it does not order restitution. As I stated in my dissenting opinion in *Disciplinary Counsel v. Galinas* (1996), 76 Ohio St.3d 87, 92, 666 N.E.2d 1083, I do not believe that a respondent should be permitted to "keep the fruits of his unethical conduct, particularly when he knowingly engaged in such unethical conduct." The settlement in this case was a windfall to the respondent. However, the settlement is not binding upon this court in a disciplinary action.

{¶ 52} Because I do not believe that the respondent should be permitted to profit from his unethical behavior, I would require him to return to the estate all the funds he unethically obtained.

O'DONNELL, J., concurs in the foregoing opinion.

_____

Jonathan E. Coughlan, Disciplinary Counsel, and Robert R. Berger Jr., Assistant Disciplinary Counsel, for relator.

Zeiger, Tigges & Little, L.L.P., and Stuart G. Parsell; and Terry K. Sherman, for respondent.