[Cite as *Johnson v. Greater Cleveland Regional Transit Auth.*, 2021-Ohio-938.]

# COURT OF APPEALS OF OHIO

# EIGHTH APPELLATE DISTRICT
# COUNTY OF CUYAHOGA

DEYA JOYCE ANN JOHNSON,           :
INDIVIDUALLY AND AS
ADMINISTRATOR OF THE ESTATE       :
OF JORDAN JOHNSON, DECEASED                    No. 109432

                                  :

       Plaintiff-Appellee/
       Cross-Appellant,           :

       v.                         :

GREATER CLEVELAND REGIONAL        :
TRANSIT AUTHORITY, ET AL.,

                                  :

       Defendants-Appellants/
       Cross-Appellees.           :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED IN PART; REVERSED
             IN PART; DISMSSED IN PART; REMANDED
**RELEASED AND JOURNALIZED:** March 25, 2021

---

Civil Appeal from the Cuyahoga County Court of Common Pleas
Case No. CV-17-879093

---

### *Appearances:*

Bashein & Bashein Co., L.P.A., W. Craig Bashein and
Thomas J. Sheehan; Paul W. Flowers Co., L.P.A., Paul W.
Flowers and Louis E. Grube, *for appellee/cross-
appellant.*

Gallagher Sharp L.L.P., Joseph W. Pappalardo and

Richard C.O. Rezie; Keith A. Ganther, Acting Deputy General Counsel-Litigation, and Sheryl King Benford, General Counsel-Deputy Counsel for Legal Affairs, *for appellants/cross-appellees.*

EILEEN A. GALLAGHER, J.:

{¶ 1} Defendants-appellants/cross-appellees the Greater Cleveland Regional Transit Authority ("GCRTA") and Gary Williams ("Williams") (collectively, "appellants") appeal the trial court's denial of their motions for summary judgment. Appellants argue that they have statutory immunity under R.C. 2744.02(A) and 2744.03(A)(6) from the wrongful death, survivorship and loss of consortium claims brought by plaintiff-appellee/cross-appellant Deya Joyce Ann Johnson ("Deya"), individually and as administrator of the estate of Jordan Johnson, deceased ("appellee"), arising out of the death of her son, Jordan Johnson ("Jordan"), in a June 20, 2016 motorcycle accident (the "accident"). Appellee contends that Williams negligently, wantonly or recklessly operated a GCRTA bus and caused her son's motorcycle accident. She cross-appeals the trial court's denial of her motion for partial summary judgment on liability against GCRTA, arguing that there is no genuine issue of material fact that Williams was negligent per se based on his violation of R.C. 4511.42(A) and Cleveland Codified Ordinances ("C.C.O.") 431.17, by failing to yield the right of way to Jordan's motorcycle.

{¶ 2} For the reasons that follow, we find that there are genuine issues of material fact as to whether Williams was negligent in operating the bus. We, therefore, affirm the trial court's denial of GCRTA's motion for summary judgment

based on statutory immunity. However, we find that there is no genuine issue of material fact that Williams did not act wantonly or recklessly in operating the bus. We, therefore, reverse the trial court's denial of Williams' motion for summary judgment based on statutory immunity. We dismiss appellee's cross-appeal for lack of jurisdiction.

**Procedural and Factual Background**

{¶ 3} On the evening of June 20, 2016, at approximately 9:50 p.m., 19-year-old Jordan was operating a 1997 Honda motorcycle northbound on Bellaire Road in Cleveland. Deya was the registered owner of the motorcycle. She testified that Jordan had purchased the motorcycle five or six weeks before the accident and that he had obtained a temporary motorcycle license shortly before he purchased the motorcycle.

{¶ 4} Jordan was returning home after a summer league basketball game in which he, his twin brother Lawrynce Johnson ("Lawrynce"), and a close friend, Richard Stokes ("Stokes"), had played that evening at Ohio Sports Net, a sports complex on W. 130th Street in Parma. Tatiana Rosa ("Rosa"), Lawrynce's then-girlfriend, was driving Lawrynce and Stokes home in her vehicle, a white 2009 Honda Accord. Lawrynce was in the front passenger seat and Stokes was in the rear passenger seat behind Lawrynce. The road was dry, and there were no weather-related issues.

{¶ 5} Williams, a GCRTA bus operator for over 26 years, was operating a passenger bus owned by GCRTA. The bus had been traveling southbound on

Bellaire Road but had stopped, with its left turn signal activated, at a red traffic light at the intersection of Bellaire Road and Leeila Avenue, intending to make a left turn onto Leeila Avenue.

{¶ 6} An unidentified vehicle, traveling northbound on Bellaire Road, was also stopped at the traffic light (the "unidentified vehicle" or the "stopped vehicle"). Its turn signal was not activated. When the light turned green, Williams moved the bus forward into the intersection. Although it also had a green light, the stopped vehicle did not proceed through the intersection on the green light. Instead, it "flashed" its high beams at the bus, then kept on its high beams, which Williams interpreted as signaling the bus that it should proceed with its left turn. Williams testified that after the stopped vehicle flashed its high beams, he "started the bus into motion" and began making the left turn onto Leeila Avenue. He indicated that he was proceeding cautiously, traveling at a speed of two or three m.p.h. "at the most," because he "couldn't see around the high beams" and "couldn't get a sharp view on the right side" of the stopped vehicle.

{¶ 7} Bellaire Road has a posted speed limit of 35 m.p.h. As the bus was proceeding with his left turn, Jordan's motorcycle was traveling northbound through the intersection on the right side of the stopped vehicle.[1] Appellee alleges

---

[1] Bellaire Road, where it intersects with Leeila Avenue, did not have white road markings dividing the road into left and right lanes. Accordingly, as discussed in greater detail below, the parties dispute whether Bellaire Road is one lane or two lanes in each direction. Appellee contends that Bellaire Road is two lanes in each direction and that the motorcycle was traveling in the right lane as it approached the intersection. Appellants contend that Bellaire Road is one lane in each direction and that the motorcycle illegally passed the stopped vehicle on the right to enter the intersection.

that the bus encroached on the motorcycle's lane of travel and that the motorcycle accelerated and swerved right as it went through the intersection on the green light to avoid colliding with the bus. Williams stopped the bus in the middle of the left turn, before it made contact with the motorcycle. Shortly after passing through the intersection, Jordan lost control of the motorcycle. The motorcycle struck the concrete curb on the right side of Bellaire Road, and Jordan was ejected from the motorcycle, suffering fatal injuries.

{¶ 8} Rosa testified that, as she approached the intersection of Bellaire Road and Leeila Avenue, Jordan's motorcycle was four or five car lengths ahead in the right lane. She indicated that her vehicle and the motorcycle were traveling at approximately the same speed, i.e., "25, 27 [m.p.h.] maybe," as they approached the intersection. Rosa testified that when she first noticed the bus, it was already turning left into the intersection and that it was turning "slowly," "maybe like 10 miles, 15 miles an hour." Rosa stated that the motorcycle entered the intersection on a green light, that the bus turned left into the path of Jordan's motorcycle and that the two vehicles were "close together" as the motorcycle entered the intersection. Rosa testified that the motorcycle swerved right in an attempt to avoid the bus and that "[h]is whole motor vehicle spun out and he fell off of his motor vehicle." Rosa could not say whether Jordan sped up in an attempt to avoid colliding with the bus once the motorcycle entered the intersection, but claimed that, before the motorcycle entered the intersection, it was not speeding. Rosa stated that the bus completed its turn in front of her vehicle, then left the scene.

{¶ 9} Lawrynce testified that when Rosa's vehicle and the motorcycle turned onto Bellaire Road from W. 130th Street, Jordan, who was wearing a motorcycle helmet with a nighttime visor, was, at first, driving his motorcycle in the left lane, then moved over into the right lane in front of Rosa's vehicle. Lawrynce testified that the motorcycle was approximately three car lengths ahead of Rosa's vehicle when it passed through the intersection. Lawrynce claimed that Rosa's vehicle was traveling at a speed of 35 m.p.h. as she proceeded down Bellaire Road "[b]ecause she doesn't go over the speed limit," but acknowledged that he did not look at the speedometer.

{¶ 10} Lawrynce testified that the light was green as Jordan's motorcycle passed through the intersection, that the bus turned left in front of the motorcycle and that the motorcycle sped up and swerved to avoid making contact with the bus. Lawrynce estimated that the motorcycle was traveling between 35-40 m.p.h. at the time of the accident. Lawrynce testified that after the motorcycle struck the curb, Jordan attempted to regain control of the motorcycle but was unsuccessful. Lawrynce stated that the bus completed its turn onto Leeila Avenue before Rosa's car cleared the intersection. The bus stopped to let people off at the bus stop on Leeila Avenue and then was "gone."

{¶ 11} Stokes testified that Jordan had been operating the motorcycle for "[a]t least three months" at the time of the accident. He testified that when they first began traveling on Bellaire Road, Jordan's motorcycle was in the left lane, Rosa's vehicle was in the right lane and the two vehicles were traveling at approximately

the same speed, i.e., 35 m.p.h. Stokes testified that he could see the speedometer in Rosa's vehicle from the backseat and saw that she was "going about 35," "maybe a little over * * * maybe 35, 40. Not too much." With respect to the speed of the motorcycle, Stokes stated that Jordan "was right in front of us, we were going 35 so he couldn't have been going no more than 40."

{¶ 12} Stokes testified that as the vehicles traveled along Bellaire Road, a vehicle was stopped ahead in the left lane with its left turn signal activated. To get around the stopped vehicle, the motorcycle moved over into the right lane in front of Rosa's vehicle. Stokes indicated that this occurred "maybe a thousand feet" before the intersection of Bellaire Road and Leeila Avenue.

{¶ 13} Because "he had to get over to the other lane," Stokes estimated that the motorcycle was traveling "maybe a little faster than us" as it approached the intersection with Leeila Avenue, "maybe 35, 40" m.p.h. However, he testified that before the bus turned in front of the motorcycle, he believed that both vehicles were traveling the speed limit. Stokes testified that Rosa's car was "right behind" the motorcycle, "[p]robably a car-and-a-half" behind the motorcycle, when it passed through the intersection. He stated that the motorcycle entered the intersection on the green light and that the bus then turned left into the path of the motorcycle, crossing over both the left lane and part of the right lane in the motorcycle's path of travel. Stokes testified that, to avoid impact with the bus, the motorcycle accelerated "probably maybe another ten miles" and swerved right "[w]hen the bus started to come at him." Stokes stated that the motorcycle struck the curb on the far-right side

of the intersection, to the right of the right-hand lane, and that the motorcycle and Jordan's body "went airborne."

{¶ 14} Stokes testified that after the motorcycle passed through the intersection, the bus stopped abruptly in the middle of its left turn. He stated that Rosa's car followed the motorcycle through the intersection and that Rosa also had to swerve right to pass through the intersection without hitting the bus. After Rosa's car cleared the intersection, Rosa stopped her vehicle on the side of the road, just past the intersection, and the three friends ran out of the car to assist Jordan. Stokes testified after he got out of the car, he saw the bus complete its left turn. After the bus cleared the intersection, the bus stopped at a bus stop on the corner approximately ten feet away, let several passengers off, then kept going.

{¶ 15} Williams testified that he first saw the motorcycle just before the intersection when it was "side by side," on the right side of the stopped vehicle. He stated that when he realized the motorcycle "wasn't going to stop," he hit the brakes. Williams testified that the motorcycle was "going pretty fast" as it approached the intersection and that it "flew past" him. Williams claimed that the front end of the bus did not extend beyond the stopped vehicle when he stopped the bus and denied that the motorcycle swerved to avoid contact with the bus. Williams stated that a white car passed through the intersection directly behind the motorcycle and that Williams then completed his left turn onto Leeila Avenue. He stated that he stopped at the bus stop on Leeila Avenue, which was approximately 100 feet from the intersection, and several passengers disembarked from the bus.

{¶ 16} Williams testified that he may have been chatting with a passenger prior to the accident. He stated that after the bus cleared the intersection, passengers told him that there had been an accident, i.e., that "the motorcycle had wiped out back there." Williams stated that he did not see what happened to the motorcycle after it passed through the intersection and that he believed, because he had stopped and avoided contact with the motorcycle, that he was not "involved" in the accident. Williams stated that he pushed a button to call GCRTA, but that his call did not go through immediately. Williams testified that he left the scene because he believed it was an "unsafe atmosphere" for himself and his passengers given the "chaos" that resulted as people rushed out of nearby apartment complexes to assist Jordan or see what was happening and because it was "a known crime area."

{¶ 17} After Williams let passengers off at the Leeila Avenue stop, he continued on his bus route until a GCRTA dispatcher directed Williams to stop the bus, based upon a notification received from transit police. Williams stopped the bus at W. 130 Street and Bellaire Road.

{¶ 18} Verne Larweh was a passenger on the bus on her way to work at the time of accident. She was seated in the back of the bus on the side opposite Williams. She stated that the bus had been stopped at a red light for two or three minutes before it started turning left and that the bus turned "not fast at all, "five [m.p.h.] * * * or something," "[j]ust barely made a slight turn," "[a] quarter way" through the turn, then stopped. She stated that the bus was stopped for "[a] few seconds" before the motorcycle passed the bus. She stated that she heard the motorcycle before she

saw it and that it appeared to be accelerating. She testified that after the bus initiated its left turn, she heard a "zoom" as the motorcycle passed the bus, "[b]ig loud motorcycle, like it revved, rev up, pass us by like, I don't know where it came from." She could not estimate the speed of the motorcycle. She stated that she saw the motorcycle "kind of swerve" to the right as it came through the intersection. She stated that she was "not sure if they were even close enough to be hitting" but that she believed if the bus had not stopped and "went a little further" and/or if the motorcycle had not swerved or accelerated, the two would have collided. She could not state how far the motorcycle swerved and could not state whether the motorcycle had accelerated to avoid colliding with the bus or was "just coming, trying to get past before the bus turned." Due to where she was sitting on the bus, Larweh could not see the motorcycle after it passed through the intersection and did not hear a crash. She stated that "the people on the bus — everybody was, started, you know, having, making a fuss saying, look at this fool or look at, you know, this idiot or whatever, just trying to pass the bus making a pass — * * * [l]ike trying to get by before the bus turned." She stated that a passenger on the other side of the bus yelled, "He fell. He fell."

{¶ 19} Larweh testified that one passenger told Williams, "You need to stop because you were involved," and that Williams responded that he "don't know why he should stop because there wasn't an impact." Larweh stated that the bus stopped at the bus stop on Leeila Avenue, waited at the stop for two to three minutes, then proceeded on its regular route for another five minutes or so until GCRTA police

called and told Williams to stop the bus. Williams stopped the bus, and the police arrived a few minutes later.

{¶ 20} Dupont Harris, another passenger on the bus at the time of the accident, testified that the bus hit the motorcycle and that he felt the impact of the crash.[2] He stated that he recalled little else about the accident other than that it occurred at a cross street, that the motorcycle was traveling on Bellaire Road and that the motorcycle's engine was "loud." Harris stated that, immediately after the accident, Williams told him that the motorcycle had "cut in front of him" and asked Harris whether he had seen what had happened. Harris testified that, at the time, he told Williams, "[y]eah, I seen it," but at his deposition, Harris stated that he could not recall whether he actually saw the motorcycle cut in front of the bus or what had happened leading up to the crash. Harris testified that Williams asked Harris whether he would testify on Williams' behalf. Harris stated that he told Williams that he would and gave Williams his contact information. Harris testified that he then got off at his stop at Leeila Avenue and walked home.

**Williams' Training**

{¶ 21} Williams testified that before he became a bus operator, he received approximately six weeks of training from GCRTA, including both classroom training

---

[2] Harris is the only witness who contends that the bus and the motorcycle made contact. All of the other witnesses testified that there was no contact between the bus and motorcycle. Video surveillance retrieved from the bus following the incident confirms that there was no contact between the bus and the motorcycle.

and on-bus training. He stated that he also periodically received refresher training from GCRTA. This training included specific training regarding left turns.

{¶ 22} Williams acknowledged, based on the training he had received and "common sense," that a bus operator should not "initiate or start moving into a left turn if there is approaching traffic," i.e., "[y]ou don't turn left if you can't see far enough down the road to turn safely."

{¶ 23} Kevin Anderson, a former GCRTA operator training instructor, testified that he trained bus operators that "if they can't see oncoming traffic or have an obstruction they are not to turn until they can see * * * that there's no oncoming traffic." Kevin Case, a GCRTA transportation safety specialist, testified that if a bus operator cannot see oncoming traffic due to an obstruction or bright lights, the bus operator should not make the left turn. Lillian Miller, GCRTA quality supervisor, similarly testified that a bus operator must ensure that all oncoming lanes are clear before initiating a left turn.

{¶ 24} In 1997, Williams received a couple of customer complaints regarding his allegedly unsafe driving practices when operating a bus. In October 2009 and February 2010, Williams was cited by a supervisor for failing to turn safely, i.e., for making right turns without blowing the horn.

**Post-Accident Suspension and Retraining**

{¶ 25} Williams was suspended following the accident. Williams testified that his dispatcher told him he was suspended but "never really told" him why and

that he "wasn't sure why" he was suspended. Williams stated that his supervisor later told him that his suspension was "canceled."

{¶ 26} Miller testified that Williams was placed on a "crisis suspension" following the accident, i.e., "when an employee is placed on suspension based on circumstances," and explained that "[a]ny time that an employee has to complete a [Federal Transit Administration] drug test they are placed on a temporary suspension until the test results come back." She stated that she did not know the results of Williams' drug test and did not know whether Williams had been suspended for leaving the scene of an accident.

{¶ 27} Williams was also required to receive "retraining" as a result of the accident. Anderson conducted the post-accident "retraining" of Williams, "going over some of the things that [Williams] could have done different[ly]." Anderson testified that Williams was retrained on "policies/procedures when witnessing [a]ccidents, [i]ncidents and [e]mergencies [p]rocedures," the operator handbook section regarding witness reports and "[r]adio [p]rocedures ([o]vert [a]larm [b]utton) [e]mergency [m]easures."

{¶ 28} Williams testified that his post-accident retraining included instruction to "take your time, get the big picture, make sure the intersection is clear before you can make the turn, and make sure you can clear the turn by using your mirrors" and that an operator should not turn if there is approaching traffic and "you feel like the turn is not safe." Williams stated that the instruction was "a refresher" and that there was "[n]othing new in it."

{¶ 29} On August 19, 2016, Anderson authored a memorandum with the subject line "Gary Williams 01275 Failed [t]o Report [a] Serious Accident . . . Left the Scene."  Anderson testified that the title of the memorandum was not entirely accurate and that he should have referenced the fact that Williams had left the scene of an accident he had "witnessed."  Anderson stated that although Williams did not believe he was "involved" in the accident because the bus did not come into contact with the motorcycle, Williams was still obligated to report the accident because he had witnessed it.

**The Bus Video**

{¶ 30} The bus was equipped with an audio/video surveillance/recording system that captured multiple different views inside and outside of the bus as well as audio from inside the bus (the "bus video").  However, the parties have differing views as to what the video shows, including what Williams could or could not see as he was proceeding with his left turn, whether the bus crossed over into the right northbound lane of Bellaire Road, whether the motorcycle accelerated as it approached the intersection and whether the motorcycle swerved right to avoid contact with the bus.

**Investigation of the Accident**

**Cleveland Police Department's Investigation**

{¶ 31} Police Officer David Cornett, a member of the Cleveland Police Department's Accident Investigation Unit, was involved in the Cleveland Police Department's investigation of the accident.  He testified that he did not do a formal

accident reconstruction but that he took photographs and digital measurements at the scene, reviewed the bus video and completed a skill diagram of the accident. He stated that by the time he arrived on the scene of the accident, after 11:00 p.m., the motorcycle and any remnants were already gone, but that he observed "scrape marks" on the curb that were "fairly fresh."

{¶ 32} Based on what he saw in the video, Officer Cornett determined that the bus and an unidentified vehicle were stopped at a red light at the intersection in opposite directions. The unidentified vehicle did not have his left turn signal activated. When the light turned green, the bus pulled forwarded a few feet. The unidentified vehicle flashed its high beams and then left them on. The bus then started to turn left "gradually and slowly," eventually crossing over the double yellow lane into the left lane. Officer Cornett stated that as the bus continued its turn, "at least the left front corner of the bus" encroached into the right northbound lane in which the motorcycle was traveling, so that the operator of the motorcycle "has a narrow area there from the curb to the front of the bus to get through." He stated that as the motorcycle enters the intersection it has "a little * * * wiggle room" to "swerve over to the right and then come back and try and stay in the right-hand lane." He could not say, however, "how much of that bus is protruding or not protruding" into the right lane.

{¶ 33} Officer Cornett stated that based on what he observed in the video, he believed the motorcycle swerved right as, or after, the bus encroached into the motorcycle's lane of travel, that the motorcycle was unable to get back into the lane

in sufficient time to avoid the curb and that the motorcycle struck the curb on the northwest corner of Bellaire Road. He indicated that once the motorcycle struck the curb, "the curb takes over with the momentum of the bike." Officer Cornett cautioned, however, that the bus video would not tell the full story of what happened:

> [Y]ou have to take into consideration too * * * when we're watching this video, we're looking what's being picked up on those cameras. Those cameras are not our eyes. That camera is seeing things in the dark that you're not going to see with your eyes. So it's kind of a disadvantage of one way, but in the other way when the guy turns on his brights[,] those cameras are also being flared out.

{¶ 34} Officer Cornett testified that he used the bus video and the distance between two cracks on Bellaire Road to calculate the motorcycle's speed. According to his calculations, the motorcycle was traveling at a speed of 51 m.p.h. as it passed through the intersection. He could not say, however, whether the motorcycle was speeding before it entered the intersection or whether the motorcycle accelerated as it passed through the intersection in an attempt to avoid the bus.

{¶ 35} Officer Cornett testified that, in his view, the "contributing circumstances" of the accident included the encroachment of the bus into the motorcycle's lane of travel and the fact that the motorcycle operator exceeded the speed limit and failed to control the motorcycle. The police crash accident report also lists as "contributing circumstances" "vision obstruction" and "failure to yield."

{¶ 36} Although the supplemental police report states that Jordan had a "VALID — Class 'D' [operator's license] with an M1 Motorcycle endorsement,"

Officer Cornett acknowledged that Jordan's driver's license and BMV abstract driver record did not indicate that he had a motorcycle endorsement. Officer Cornett stated that Williams was not cited for leaving the scene of an accident but that he believed Williams had a duty to remain on the scene given his role in the accident.

**The Parties' Accident Reconstruction Experts**

{¶ 37} Appellants and appellee both retained experts to reconstruct the accident and determine the cause of the accident. Charles Veppert conducted an accident reconstruction on behalf of appellee. He opines that "the proximate cause of the crash was [Williams'] decision to attempt a left turn while he was partially blinded by the high beam headlights of the oncoming vehicle." He explained:

> As Mr. Williams noted in his deposition, the driver of the car opposite him flashed his high beams for him to turn — and even though he could not see around the high beams he began to accelerate forward and begin his left turn less than one second later. In the RTA driver's manual it expressly warns[:] "Do not rely on the other driver's signals. * * * Other drivers OFTEN signal improperly." While the video shows some sign of the oncoming motorcycle (spikes of light glare) the motorcycle was essentially hidden behind the glare of the car's high beams until it was about to enter the intersection.

{¶ 38} Veppert further opined that Jordan "did not have sufficient distance or time available to stop [the motorcycle] to avoid striking the bus" that had turned into his lane of travel and that, therefore, Jordan was "required * * * to employ some manner of avoidance maneuver." He stated that the "only reasonable option" available to Jordan was "to steer to the right and accelerate around the bus before the path was totally blocked." Veppert indicated that although Jordan "was successful in avoiding impact with the bus," he "could not avoid contact with the

concrete curb about 50 - 60 feet beyond the intersection which caused his loss of control."

{¶ 39} Henry Lipian conducted an accident reconstruction on behalf of appellants. He opined that Williams "exercised reasonable care in the manner in which he operated his bus" and that the proximate cause of accident was "the reckless driving actions by Mr. Johnson, who lost control after he had sped past the stopped bus and struck the curb." Lipian claimed that the motorcycle was traveling at a speed of 57 or 60 m.p.h.[3] and that Jordan "engaged in an extremely dangerous maneuver of passing a stopped vehicle on the right at high speed, within a single lane of traffic, while approaching an intersection at night."

{¶ 40} Lipian disputes appellee's claim that the motorcycle swerved prior to passing the bus. He states that when viewing the video in a frame-by-frame format, it shows that "the motorcycle essentially remained on a straight course as it passed in front of the bus." He also disputes that Williams was partially blinded by the high-beam headlights of the stopped vehicle. He states that although the video shows a glow around the headlights of the stopped vehicle, it is impossible to tell from the video the extent of any "veiling glare" from the high-beam headlights.

---

[3] The copy of Lipian's report submitted with appellants' summary judgment filings contains two versions of page 19 of his report. In the first version, Lipian states that "Mr. Johnson was operating an unsafe vehicle and at high speed (~57 M.P.H. in a 35 M.P.H.) zone." In the second version, Lipian states that "Mr. Johnson was operating an unsafe vehicle and at high speed (~60 M.P.H. in a 35 M.P.H.) zone."

### Appellee's Lawsuit

**{¶ 41}** On April 19, 2017, appellee filed a complaint in the Cuyahoga County Court of Common Pleas, asserting wrongful death, survivorship and loss of consortium claims against GCRTA and Williams related to the June 20, 2016 accident. Appellee alleged that Williams was negligent in "failing to yield the right of way to an oncoming vehicle," "failing to control his vehicle," "failing to maintain a proper lookout for other operators" and "making an improper left turn." Appellee further alleged that Williams operated his vehicle "in a reckless manner without regard for the safety of other drivers" and had "left the scene of an accident leaving [Jordan] on the roadway severely injured and needing medical attention," "represent[ing] a conscious disregard for [Jordan's] safety * * * with substantial certainty that harm, further harm, and/or his death would occur."

**{¶ 42}** GCRTA and Williams filed separate answers, denying any wrongdoing and asserting various affirmative defenses, including statutory immunity and contributory negligence. GCRTA also asserted (1) a counterclaim for negligent entrustment against Deya, as the owner of the motorcycle, and (2) third-party claims for indemnification and contribution against the John Doe operator of the stopped vehicle that had "blocked the intersection at Leeila Avenue and Bellaire Road" at the time of the accident.[4]

---

[4] With respect to the John Doe vehicle operator, GCRTA alleged that he or she had "unreasonably obstructed vehicle traffic from traveling safely" at or near the intersection and that his or her conduct in "leaving [the] high beam bright lights on for an unreasonable period of time and repeatedly flashing them at oncoming motorists" while

**Motions for Summary Judgment**

{¶ 43} In September 2018, Williams and GCRTA filed separate motions for summary judgment. GCRTA argued that it was entitled to summary judgment on appellee's claims because there was no genuine issue of material fact that Williams was not negligent in operating the bus and GCRTA was, therefore, immune from liability under R.C. 2744.02(A). Specifically, GCRTA argued that "undisputed facts" established that the motorcycle was proceeding in an unlawful manner as it approached the intersection and that the bus, therefore, had the right of way to proceed with its left turn through the intersection.

{¶ 44} Williams argued that he was entitled to summary judgment on appellee's claims because there was no evidence that he had acted wantonly or recklessly and he was, therefore, immune from liability under R.C. 2744.03(A)(6).

{¶ 45} Appellee filed a combined opposition to appellants' motions for summary judgment and a "cross-motion for partial summary judgment on liability" on her claims against GCRTA. Appellee argued that the evidence showed that GCRTA was liable for Jordan's injuries and death "under principles of ordinary negligence" and the exceptions to immunity set forth in R.C. 2744.02(B)(1) and (B)(2). Specifically, appellee argued that Williams was required to yield to the right of way to Jordan's motorcycle and that Williams' violation of R.C. 4511.42(A) warranted a finding of negligence per se against GCRTA. Appellee further argued

---

blocking traffic so that vehicles behind his or vehicle could not safely proceed through the intersection was "wanton, willful and reckless" and caused Jordan's injuries.

that a jury could reasonably find that Williams had acted recklessly and wantonly and was liable for Jordan's injuries and death under R.C. 2744.03(A)(6)(b).[5]

{¶ 46} In support of their summary judgment filings, the parties submitted deposition testimony from appellee, Williams, Lawrynce, Stokes, Rosa, Officer Cornett, Larweh, Harris, Miller, Anderson, Case and others — the relevant portions of which have been summarized above. In addition, appellants submitted: (1) an affidavit from Robert Mavec, the Commissioner of Cleveland's Division of Traffic Engineering, who averred that "Bellaire Road and Leeila Avenue is designated as one * * * lane of travel in the northbound and southbound directions," (2) an affidavit from Charles Brown, the Security Systems Manager for GCRTA, attaching a CD of the bus video, (3) an affidavit, report and curriculum vitae from Lipian and (4) an abstract driver record for Jordan from the Ohio Bureau of Motor Vehicles, dated January 31, 2018. Appellee also submitted: (1) an affidavit, report and curriculum vitae from Veppert and (2) an affidavit, report and curriculum vitae from Dr. Robert Corn, a former orthopedic surgeon, regarding Jordan's pain and suffering and cause of death.

---

[5] Although in her cross-motion for partial summary judgment appellee requested that "[s]ummary judgment * * * be granted * * * *upon liability* in favor of Plaintiff and against Defendant GCRTA," in her reply brief in support of her cross-motion for partial summary judgment, appellee asserted that, "at this stage of the proceedings, [p]laintiff only seeks partial summary judgment on the issue of [Williams'] negligence per se" and requested that the trial court "enter partial summary judgment in favor of Plaintiff finding that Defendant Williams is negligent per se for violating R.C. 4511.42." (Emphasis added.)

{¶ 47} The trial court denied appellants' motions for summary judgment, concluding that "there remain material issues of fact" and that appellants were not entitled to judgment as a matter of law. The trial court also denied appellee's cross-motion for partial summary judgment on liability, stating that "material issues of fact prevent [the trial court] from finding that [GCRTA] is liable as a matter of law."

{¶ 48} GCRTA and Williams appealed, raising the following assignment of error for review:

> The trial court erred by denying defendants' motion for summary judgment on the grounds on immunity and liability.

{¶ 49} Appellee cross-appealed, raising the following cross-assignment of error for review:

> Given the undisputed circumstances that occurred at the intersection, the trial court erred in failing to find that defendant-appellant/cross-appellee City of Cleveland is liable as a matter of law for negligently causing the fatal accident.

**Law and Analysis**

**Jurisdiction Limited to Immunity Determination**

{¶ 50} As an initial matter, we must consider our jurisdiction to hear this appeal and cross-appeal. An order denying a motion for summary judgment is generally not a final, appealable order. *See, e.g., Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, ¶ 9; *Celebrezze v. Netzley*, 51 Ohio St.3d 89, 90, 554 N.E.2d 1292 (1990). However, R.C. 2744.02(C) states: "An order that denies a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability as provided in this chapter or any other provision of

the law is a final order." The Ohio Supreme Court has held that "when a trial court denies a motion in which a political subdivision or its employee seeks immunity under R.C. Chapter 2744, that order denies the benefit of an alleged immunity and thus is a final, appealable order pursuant to R.C. 2744.02(C)." *Hubbell* at ¶ 27. Thus, R.C. 2744.02(C) grants appellate courts jurisdiction to review a trial court order denying a motion for summary judgment based upon immunity.

{¶ 51} Such jurisdiction is, however, "limited to the review of alleged errors in the portion of the trial court's decision that denied the political subdivision [or its employee] the benefit of immunity." *Reinhold v. Univ. Hts.*, 8th Dist. Cuyahoga No. 100270, 2014-Ohio-1837, ¶ 21, citing *Riscatti v. Prime Properties Ltd. Partnership*, 137 Ohio St.3d 123, 2013-Ohio-4530, 998 N.E.2d 437, ¶ 20; *see also Alpha Plaza Invests., Ltd. v. Cleveland*, 2018-Ohio-486, 105 N.E.3d 680, ¶ 19 (8th Dist.) ("An appeal from the denial of a motion seeking judgment against a plaintiff's claim based on sovereign immunity is limited to review of only the trial court's decision denying the political subdivision the benefit of immunity."), citing *Windsor Realty & Mgt., Inc. v. Northeast Ohio Regional Sewer Dist.*, 2016-Ohio-4865, 68 N.E.3d 327, ¶ 15 (8th Dist.). Thus, when a denial of a motion for summary judgment on statutory immunity grounds is appealed under R.C. 2744.02(C), the parties cannot raise other alleged errors concerning the denial of summary judgment on other grounds. R.C. 2744.02(C) "does not throw open the door to all interlocutory matters" and does not authorize the appellate court to otherwise review the merits of a trial court's decision to deny a motion for summary judgment. *Brown v. Cincinnati*, 1st Dist. Hamilton

No. C-200031, 2020-Ohio-5418, ¶ 6-7 ("'appellate review under R.C. 2744.02(C) is limited to the denial of immunity'"), quoting *Leasure v. Adena Local School Dist.*, 2012-Ohio-3071, 973 N.E.2d 810, ¶ 43 (4th Dist.); *see also CAC Bldg. Properties, L.L.C. v. Cleveland*, 8th Dist. Cuyahoga No. 91991, 2009-Ohio-1786, ¶ 9, fn. 1 (appellate court had jurisdiction to review city's appeal only with respect to issues that were based on the trial court's denial of summary judgment on immunity grounds; other issues city raised on appeal with respect to the denial of its summary judgment motion were not reviewable); *Hardesty v. Alcantara*, 2015-Ohio-4591, 48 N.E.3d 127, ¶ 47 (8th Dist.) (declining to address issues of proximate causation in appeal of denial of motion for summary judgment based on exception to immunity under R.C. 2744.03(A)(6)(b), concluding that "[t]he issue of proximate cause * * * is not yet ripe for review as we only have jurisdiction to address the issue of immunity in this interlocutory appeal"); *Sickles v. Jackson Cty. Hwy. Dept.*, 196 Ohio App.3d 703, 2011-Ohio-6102, 965 N.E.2d 330, ¶ 30 (4th Dist.) (appellate court had no jurisdiction to consider issue of contributory negligence when reviewing denial of motion for summary judgment on grounds of immunity because "while contributory fault impacts the ultimate success of a plaintiff's negligence claims, it does not impact a political subdivision's immunity from liability"); *cf. McCullough v. Youngstown City School Dist.*, 2019-Ohio-3965, 145 N.E.3d 996, ¶ 58 and fn. 1, 4 (7th Dist.) ("[F]ailure to grant summary judgment on the issue of comparative negligence would not be appealable as it does not deny the political subdivision the benefit of immunity as required by R.C. 2744.02(C).").

{¶ 52} In her cross-appeal, appellee appeals the trial court's denial of her motion for partial summary judgment on liability. She argues that, based on Williams' violation of R.C. 4511.42(A) and C.C.O. 431.17, there is no genuine issue of material fact that Williams was negligent per se and that the trial court, therefore, erred in denying her motion for summary judgment "on the issue of breach of duty."[6] However, the denial of appellee's motion for partial summary judgment does not "den[y] a political subdivision or an employee of a political subdivision the benefit of an alleged immunity from liability"; therefore, appellee's cross-appeal is not within the scope of appellate jurisdiction authorized under R.C. 2744.02(C).

{¶ 53} In an attempt to circumvent this limitation on our jurisdiction, appellee argues that because the "same order" that denied appellants' motions for summary judgment on immunity grounds denied her "inextricably intertwined" cross-motion for partial summary judgment on liability —"involv[ing] the same parties, the same fatal accident, and the same claims and defenses" — she is

---

[6] In her appellate reply brief, appellee asserts that her cross-assignment of error "has nothing to do with causation as Plaintiff had only sought summary judgment against Defendant GCRTA upon derivative liability as permitted by both R.C. 2744.02(B)(1) and (B)(2)." (Emphasis deleted.) However, her cross-assignment of error specifically references causation. Further, "derivative liability" under R.C. 2744.02(B)(1) or (B)(2) requires a showing of proximate cause. *See* R.C. 2744.02(B)(1) (political subdivision is liable for "injury, death, or loss to person or property *caused* by the negligent operation of any motor vehicle by their employees when the employees are engaged within the scope of their employment and authority") (emphasis added); R.C. 2744.02(B)(2) (political subdivision is liable for "injury, death, or loss to person or property *caused* by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions") (emphasis added). However, regardless of whether appellee moved for partial summary judgment on the issue of GCRTA's "liability" or only on the issue of "breach of duty," we lack jurisdiction to hear her cross-appeal.

"logically entitled to seek appellate review" of the trial court's decision as well. We disagree. As stated above, the law is clear. Our jurisdiction in an appeal brought pursuant to R.C. 2744.02(C) is "limited to the review of alleged errors *in the portion of the trial court's decision that denied the political subdivision the benefit of immunity*" — nothing more. (Emphasis added.) *Reinhold*, 2014-Ohio-1837, at ¶ 21; *see also Gates v. Leonbruno*, 2016-Ohio-5627, 70 N.E.3d 1110, ¶ 31-32 (8th Dist.) (rejecting the argument that "pendent jurisdiction applies to expand the scope of [appellate] jurisdiction * * * beyond that which is expressly authorized under R.C. 2744.02(C)"), citing Ohio Constitution, Article IV, Section 3(B)(2) and R.C. 2501.02. This is not a case, such as *Johnson v. Cleveland*, 194 Ohio App.3d 355, 2011-Ohio-2152, 956 N.E.2d 355, ¶ 15 (8th Dist.), cited by appellee, in which this court's decision "would effectively deny any 'meaningful review' of the issue" raised in the cross-appeal.

{¶ 54} Here, we only have jurisdiction to decide whether the trial court properly denied Williams' and GCRTA's motions for summary judgment based on statutory immunity, "'not the issues that go to the merits of the claims.'" *Alpha Plaza*, 2018-Ohio-486, 105 N.E.3d 680, at ¶ 21, quoting *Reinhold* at ¶ 21; *see also O'Farrell v. Harlem Twp. Bd. of Trustees*, 5th Dist. Delaware Nos. 18 CAH 08 0058 and 18 CAH 08 0062, 2019-Ohio-1675, ¶ 56 ("R.C. 2744.02(C) limits our jurisdiction to deciding whether the trial court erroneously determined that appellants were not entitled to sovereign immunity. We cannot decide whether the merits of the action otherwise warrant summary judgment."). Because R.C.

2744.02(C) does not provide us with jurisdiction to consider issues other than the trial court's decision on immunity and because the order appealed from is not otherwise final, we lack jurisdiction to consider appellee's cross-appeal. We, therefore, dismiss appellee's cross-appeal.

**Standard of Review on Summary Judgment**

{¶ 55} This court reviews a trial court's ruling on a motion for summary judgment de novo, applying the same standard as the trial court. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996). We accord no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶ 56} Under Civ.R. 56, summary judgment is appropriate when no genuine issue exists as to any material fact and, viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the nonmoving party, entitling the moving party to judgment as a matter of law.

{¶ 57} On a motion for summary judgment, the moving party carries an initial burden of identifying specific facts in the record that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264 (1996). If the moving party fails to meet this burden, summary judgment is not appropriate; if the moving party meets this burden, the nonmoving party must then point to evidence of specific facts in the record demonstrating the

existence of a genuine issue of material fact for trial. *Id.* at 293. If the nonmoving party fails to meet this burden, summary judgment is appropriate. *Id.*

{¶ 58} Thus, this court must conduct a "de novo review of the law and facts" to determine whether (1) only questions of law remain, which this court may then resolve, or (2) a genuine issue of material fact exists, requiring a remand to the trial court for "further development of the facts necessary to resolve the immunity issue." *Hubbell,* 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878, at ¶ 21.

### Statutory Immunity of Political Subdivision and Its Employees

{¶ 59} Ohio's Political Subdivision Tort Liability Act, codified in R.C. Chapter 2744, "sets forth a comprehensive statutory scheme for the tort liability of political subdivisions and their employees." *McConnell v. Dudley*, 158 Ohio St.3d 388, 2019-Ohio-4740, 144 N.E.3d 369, ¶ 20, citing *Supportive Solutions, L.L.C., v. Electronic Classroom of Tomorrow*, 137 Ohio St.3d 23, 2013-Ohio-2410, 997 N.E.2d 490, ¶ 11. We first address GCRTA's arguments for immunity under R.C. Chapter 2744.

### GCRTA's Claim of Immunity

{¶ 60} Determining whether a political subdivision is entitled to immunity from civil liability under R.C. Chapter 2744 requires a three-tiered analysis. *Hortman v. Miamisburg*, 110 Ohio St.3d 194, 2006-Ohio-4251, 852 N.E.2d 716, ¶ 9, citing *Cater v. Cleveland*, 83 Ohio St.3d 24, 28, 697 N.E.2d 610 (1998). The first tier of the analysis involves the general grant of immunity to political subdivisions under R.C. 2744.02(A)(1), which provides that "a political subdivision is not liable

in damages in a civil action for injury, death, or loss to person or property allegedly caused by any act or omission of the political subdivision or an employee of the political subdivision in connection with a governmental or proprietary function." *Hortman* at ¶ 10-11. That immunity, however, is not absolute. *See* R.C. 2744.02(B); *Riffle v. Physicians & Surgeons Ambulance Serv., Inc.*, 135 Ohio St.3d 357, 2013-Ohio-989, 986 N.E.2d 983, ¶ 15.

**{¶ 61}** The second tier of the immunity analysis involves determining whether any of the five exceptions to immunity that are listed in R.C. 2744.02(B) apply. *Smith v. McBride*, 130 Ohio St.3d 51, 2011-Ohio-4674, 955 N.E.2d 954, ¶ 14; *Colbert v. Cleveland*, 99 Ohio St.3d 215, 2003-Ohio-3319, 790 N.E.2d 781, ¶ 8.

**{¶ 62}** If any of the five exceptions to immunity in R.C. 2744.02(B) applies (and if any defenses that may be asserted by the political subdivision under R.C. 2744.02(B)(1) to negate liability do not apply), then the third tier of the immunity analysis requires a court to determine whether any of the defenses in R.C. 2744.03 apply to reinstate the political subdivision's immunity. *Smith* at ¶ 15; *Colbert* at ¶ 9.

**Exceptions to Political Subdivision Immunity Under R.C. 2744.02(B)(1) and (B)(2)**

**{¶ 63}** In this case, there is no dispute that GCRTA is a political subdivision, subject to the general grant of immunity under R.C. 2744.02(A). At issue here are the exceptions to immunity set forth in R.C. 2744.02(B)(1) and 2744.02(B)(2).

**{¶ 64}** Under R.C. 2744.02(B)(1), a political subdivision is liable for "injury, death, or loss to person or property caused by the negligent operation of any motor

vehicle by their employees when the employees are engaged within the scope of their employment and authority."  Under R.C. 2744.02(B)(2), a political subdivision is liable for "injury, death, or loss to person or property caused by the negligent performance of acts by their employees with respect to proprietary functions of the political subdivisions."  Pursuant to R.C. 2744.01(G)(2)(c), "proprietary function" specifically includes the "operation of a * * * busline or other transit company." There is no dispute that Williams is a GCRTA employee who was acting within the scope of his employment and authority while operating the bus at the time of the accident. [7]

{¶ 65} Actionable negligence requires a showing of a duty, a breach of that duty and an injury proximately resulting that breach of duty.  *Menifee v. Ohio Welding Prods., Inc.*, 15 Ohio St.3d 75, 77, 472 N.E.2d 707 (1984).  The existence and conditions of a duty between two parties are determined by the nature of the relationship between them.  *Wallace v. Ohio Dept. of Commerce*, 96 Ohio St.3d 266, 2002-Ohio-4210, 773 N.E.2d 1018, ¶ 23.  The duty element of negligence may be established by common law, by legislative enactment or by the particular circumstances of a given case.  *Schmitz v. NCAA*, 2016-Ohio-8041, 67 N.E.3d 852 ¶ 48 (8th Dist.), citing *Chambers v. St. Mary's School*, 82 Ohio St.3d 563, 565, 697 N.E.2d 198 (1998).

---

[7] Although, as set forth in the statute, certain exceptions and defenses exist to the application of R.C. 2744.02(B)(1) and 2744.02(B)(2), there is no claim that any of those exceptions or defenses apply here.  Likewise, there is no claim in this case that any of the defenses in R.C. 2744.03 apply to reinstate the political subdivision's immunity under the "third tier" of the immunity analysis.

{¶ 66} Appellants contend that the trial court erred in denying GCRTA's motion for summary judgment because there is no genuine issue of material fact that Williams was not negligent in operating the bus and GCRTA was, therefore, immune from liability under R.C. 2744.02(A). Appellants assert that because Jordan was speeding, illegally passed the stopped vehicle on the right and was operating the motorcycle at night without a valid motorcycle endorsement to his driver's license, the motorcycle was not proceeding "lawfully" as it approached the intersection and the bus, therefore, had no duty to yield to the right of way of the motorcycle when making its left turn.

{¶ 67} Appellee responds that the trial court properly denied GCRTA's motion for summary judgment because evidence shows that Williams was negligent in operating the bus and that Williams' negligence was a proximate cause of Jordan's accident. Appellee contends that Williams was required to yield to the right of way of Jordan's motorcycle when turning left, that Williams violated R.C. 4511.42(A) and C.C.O. 431.17 by turning left into the motorcycle's lane of travel and that, as a result of Williams' actions and to avoid colliding with the bus, Jordan was forced to accelerate and swerve right, causing him to strike the curb and lose control of the motorcycle, resulting in his death.

{¶ 68} GCRTA's motion for summary judgment was limited to elements of duty and breach. It did not address causation. Accordingly, as it relates to GCRTA's immunity, the issue on appeal is whether there is a genuine issue of material fact that Williams was negligent in his operation of the bus, i.e., whether Williams

breached a duty of care owed to Jordan.  Following a thorough review of the record, we find that genuine issues of fact exist as to whether Williams was negligent in his operation of the bus.  Accordingly, the trial court did not err in denying GCRTA's motion for summary judgment.

**Right of Way**

{¶ 69} It is well-established that a vehicle turning left at an intersection has a statutory duty to yield the right of way to oncoming traffic.  R.C. 4511.42(A) states:

> The operator of a vehicle * * * intending to turn to the left within an intersection or into an alley, private road, or driveway shall yield the right of way to any vehicle * * * approaching from the opposite direction, whenever the approaching vehicle * * * is within the intersection or so close to the intersection, alley, private road, or driveway as to constitute an immediate hazard.

*See also* C.C.O. 431.17.

{¶ 70} "Right-of-way" is defined, in relevant part, as:

> The right of a vehicle * * * to proceed uninterruptedly in a lawful manner in the direction in which it * * * is moving in preference to another vehicle * * * approaching from a different direction into its * * * path[.]

R.C. 4511.01(UU)(1).

{¶ 71} These provisions establish a "preferential status" for the vehicle with the right of way.  *Anderson v. Schmidt*, 8th Dist. Cuyahoga No. 99084, 2013-Ohio-3524, ¶ 22, citing *Deming v. Osinski*, 21 Ohio App.2d 89, 255 N.E.2d 279 (11th Dist.1969), *affirmed*, 24 Ohio St.2d 179, 265 N.E.2d 554 (1970).  The vehicle with the right of way has a right to proceed uninterruptedly in a lawful manner through the intersection and other vehicles turning left must yield to its right of way.  *See,*

*e.g., Anderson* at ¶ 24, citing *Vavrina v. Greczanik*, 40 Ohio App.2d 129, 135, 318 N.E.2d 408 (8th Dist.1974); *cf. Ramos v. Kalfas*, 8th Dist. Cuyahoga No. 64806, 1994 Ohio App. LEXIS 2171, 17-18 (May 19, 1994) ("[A] driver with a right of way bears no duty to look for and yield to drivers who violate the right of way at an intersecting stop."). In the absence of knowledge to the contrary,[8] the driver of a vehicle lawfully proceeding in its right of way has the right to assume other drivers will obey any laws requiring them to yield the right of way and has no duty to watch for approaching vehicles that may threaten to violate the right of way. *See, e.g., Anderson* at ¶ 24; *McCullough*, 2019-Ohio-3965, 145 N.E.3d 996, at ¶ 46; *Lydic v. Earnest*, 7th Dist. Mahoning No. 02 CA 125, 2004-Ohio-3194, ¶ 25-34; *Morris v. Bloomgren*, 127 Ohio St. 147, 187 N.E. 2 (1933), paragraphs one and five of the syllabus.

{¶ 72} However, a vehicle with the right of way "forfeits" its preferential status if it does not "proceed * * * in a lawful manner." *See, e.g., Anderson* at ¶ 24; *Westfall v. Lemon*, 4th Dist. Washington No. 14CA12, 2015-Ohio-384, ¶ 17 ("[W]hen

---

[8] A driver with the right of way does have a duty, if he or she discovers that another is not yielding the right of way and has thereby placed himself or herself in a dangerous situation, to use ordinary care not to injure the latter after becoming aware of the situation. *See, e.g., McCullough*, 2019-Ohio-3965, 145 N.E.3d 996, at ¶ 47 ("'If * * * the [driver with the right of way], just as he is approaching or entering the intersection, discovers that the latter is not yielding the right of way and has thereby placed himself in a perilous situation, it becomes the duty of the former to use ordinary care not to injure the latter after becoming aware of his perilous situation.'" * * * The exception asks not whether a reasonable driver should have noticed the peril but whether the driver in fact noticed the peril and, if so, whether she then used ordinary care under the circumstances."), quoting *Deming,* 24 Ohio St.2d at 182, 265 N.E.2d 554, quoting *Morris v. Bloomgren*, 127 Ohio St. 147, 187 N.E. 2 (1933), paragraph five of syllabus.

a vehicle is not proceeding in a lawful manner, the driver of the vehicle loses the right of way."); *Vavrina* at 135 ("The law gives to the operator of a vehicle on the highway who has the right of way a shield, an absolute right to proceed uninterruptedly, but he forfeits the shield if he fails to proceed in a lawful manner."), citing *Beers v. Wills*, 172 Ohio St. 569, 571, 179 N.E.2d 57 (1962); *Morris* at paragraph three of the syllabus ("The phrase 'in a lawful manner,' * * * is a *sine qua non* obligation placed upon the vehicle upon which the right of way is conferred. If such vehicle is not proceeding in a lawful manner in approaching or crossing the intersection, but is proceeding in violation of a law or ordinance, such vehicle loses its preferential status and the relative obligations of the drivers of the converging vehicles are governed by the rules of the common law.").

{¶ 73} A vehicle proceeds in a lawful manner where it complies with applicable traffic laws. *Anderson* at ¶ 25; *Carrozza v. Landis*, 10th Dist. Franklin No. 11AP-1009, 2012-Ohio-6194, ¶ 15; *Noaker v. Gerdeman*, 3d Dist. Henry No. 7-03-10, 2004-Ohio-2799, ¶ 7, citing *Vavrina* at 136. "The law presumes that a vehicle that ostensibly has the right of way is proceeding lawfully." *Anderson* at ¶ 26; *see also State v. Kay*, 9th Dist. Summit No. 28772, 2018-Ohio-2709, ¶ 8; *Liegel v. Bainum*, 12th Dist. Clermont No. CA2011-06-049, 2011-Ohio-6022, ¶ 13. Accordingly, a party who asserts that an opposing vehicle's right of way has been forfeited must present evidence rebutting the presumption that the opposing vehicle was proceeding in a lawful manner. *Anderson* at ¶ 27.

**{¶ 74}** We disagree with appellants' contention that reasonable minds could only conclude that the motorcycle was proceeding in an unlawful manner when it entered the intersection of Bellaire Road and Leeila Avenue.

**{¶ 75}** First, the evidence shows a dispute exists as to whether the motorcycle was speeding as it entered the intersection. Although Lipian opines that the motorcycle was traveling at a speed of 57 or 60 m.p.h., Rosa, Lawrynce and Stokes offered testimony from which a jury could reasonably find that the motorcycle was not traveling above the posted speed limit. Further, although Officer Cornett calculated the motorcycle's speed as 51 m.p.h. when he passed through the intersection, he could not say whether the motorcycle was speeding generally or whether Jordan merely accelerated in reaction to seeing the bus, in order to avoid colliding with the bus, after the bus had turned into the motorcycle's lane of travel.

**{¶ 76}** Appellants argue that the testimony of Rosa, Lawrynce and Stokes regarding the speed of the motorcycle is insufficient to create a genuine issue of material fact because they "didn't testify as expert witnesses" and such testimony is inadmissible under Evid.R. 701. We disagree.

**{¶ 77}** Evid.R. 701 governs the admissibility of lay witness opinion testimony. It states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (1) rationally based on the perception of the witness and (2) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

{¶ 78} Lay witnesses are routinely permitted to testify regarding the rate of speed a motor vehicle traveling that is based on their personal observation. *See, e.g., State v. Urbina*, 2016-Ohio-7009, 72 N.E.3d 105, ¶ 52 (10th Dist.) ("Generally, lay witnesses may give their opinions on matters they have actually observed 'such as the speed that an automobile was traveling * * *'"), quoting *Urbana ex rel. Newlin v. Downing*, 43 Ohio St.3d 109, 539 N.E.2d 140 (1989), fn. 2; *State v. Schofield*, 11th Dist. Portage No. 98-P-0099, 1999 Ohio App. LEXIS 5945, 5-6 (Dec. 10, 1999) ("It is a generally accepted principle that a lay witness may testify to the speed of an automobile * * * when the lay witness has made personal observations of the speed[.]"), citing *State v. Auerbach*, 108 Ohio St. 96, 140 N.E. 507 (1923), paragraph one of the syllabus; *see also State v. McKee*, 91 Ohio St.3d 292, 296, 744 N.E.2d 737 (2001) ("Evid.R. 701 contemplated testimony about such ordinary things as * * * speed[.]").

{¶ 79} Here, Rosa, Lawrynce and Stokes personally observed the motorcycle as it was traveling immediately prior to the accident. Rosa's vehicle was following directly behind the motorcycle as it entered the intersection. Their opinions regarding the speed of the motorcycle appear were both "rationally based" on their perception and "helpful to * * * the determination of a fact in issue." As such, their testimony could be used to support appellee's claim that the motorcycle was not speeding, and was proceeding in a lawful manner, in the moments leading up to the accident.

{¶ 80} Further, as appellants readily acknowledge in their brief, although a driver can forfeit the right of way if he or she unlawfully operates his or her vehicle at a speed in excess of the posted limit, under the circumstances at issue here, "'evidence of speed in excess of a posted speed limit alone is not conclusive that a vehicle is proceeding unlawfully and has forfeited its right of way.'" (Emphasis deleted.) *State v. Cline*, 10th Dist. Franklin No. 14AP-610, 2015-Ohio-4036, ¶ 19, quoting *In re Neill*, 160 Ohio App.3d 439, 2005-Ohio-1696, 827 N.E.2d 811, ¶ 13 (3d Dist.). As the court explained in *Cline*:

> Where a statute or ordinance makes it prima facie unlawful for a motor vehicle to travel above a certain speed limit, a speed greater than that specified does not establish the commission of an offense or constitute unlawful conduct per se, but establishes only a prima facie case under the ordinance. *Upper Arlington v. Conley*, 10th Dist. No. 06AP-332, 2006-Ohio-6648, ¶ 15, citing *Cleveland v. Keah*, 157 Ohio St. 331, 105 N.E.2d 402 (1952), paragraphs one and two of the syllabus. The prima facie case may be overcome "by evidence showing that in the circumstances the speed was neither excessive nor unreasonable." *Id. See also State v. Legg*, 5th Dist. Licking No. 04 CA 63, 2005-Ohio-2376, ¶ 15 (where evidence is presented that the victim's vehicle was traveling at speeds above the posted limit, it creates a presumption that it was proceeding in an unlawful manner, which can be rebutted by evidence showing that the speed was reasonable for the conditions).

*Cline* at ¶ 19; *see also Cleveland v. Farrell*, 8th Dist. Cuyahoga No. 100136, 2014-Ohio-3131, ¶ 21-22; R.C. 4511.21(C); C.C.O. 433.03(c).

{¶ 81} Thus, although it may have been "prima facie unlawful" for the motorcycle to have exceeded the posted speed limit, even if the motorcycle was exceeding the posted speed limit, it may have still been "proceeding lawfully," thereby maintaining its right of way, if it was determined that the motorcycle's speed

was reasonable given the surrounding circumstances. *See, e.g., Cline* at ¶ 19; *Upper Arlington v. Streets*, 10th Dist. Franklin No. 94APC04-534, 1994 Ohio App. LEXIS 5840 (Dec. 20, 1994); *State v. West*, 12th Dist. Clermont No. CA89-11-096, 1990 Ohio App. LEXIS 1371, 5-6 (Apr. 9, 1990). Whether a driver's speed is excessive or unreasonable under the circumstances is generally a question of fact. *See, e.g., Conley* at ¶ 16, citing *Columbus v. Cantwell*, 10th Dist. Franklin No. 80AP-915, 1981 Ohio App. LEXIS 12904 (May 14, 1981); *Legg* at ¶ 15, quoting *State v. Shuler*, 5th Dist. Fairfield No. 97-CA-62, 1998 Ohio App. LEXIS 1337, 4 (Mar. 16, 1998).

{¶ 82} The evidence also shows a dispute exists regarding (1) whether Bellaire Road where it intersects with Leeila Avenue is a one-lane road and (2) whether Jordan violated R.C. 4511.28 and C.C.O. 431.04 by passing the stopped vehicle on the right.

{¶ 83} Based on the absence of road markings dividing the northbound and southbound lanes of Bellaire Road into left and right lanes and Mavec's averment in his affidavit that "Bellaire Road and Leeila Avenue is designated as one * * * lane of travel in the northbound and southbound directions," appellants contend that there is no genuine issue of material fact that Bellaire Road is one-lane in each direction. Appellants maintain that because Mavec (as the Commissioner of the City of Cleveland's Division of Traffic Engineering) is charged with "lay[ing] out roadway markings" under C.C.O. 131.53, he is "[t]he only person competent to testify as to whether Bellaire is one lane or two lanes in each direction of travel." We disagree.

{¶ 84} Appellants have not identified any statute or ordinance that requires specific roadway markings in order for a road to constitute a two-lane road. R.C. 4511.28 states:

(A) The driver of a vehicle * * * may overtake and pass upon the right of another vehicle * * * only under the following conditions:

(1) When the vehicle * * * overtaken is making or about to make a left turn;

(2) Upon a roadway with unobstructed pavement of sufficient width for two or more lines of vehicles moving lawfully in the direction being traveled by the overtaking vehicle.

(B) The driver of a vehicle * * * may overtake and pass another vehicle * * * only under conditions permitting such movement in safety. The movement shall not be made by driving off the roadway.

*See also* C.C.O. 431.04.

{¶ 85} Although there are no road markings dividing Bellaire Road into two lanes in each direction, there is evidence from which the jury could reasonably find that Bellaire Road was "of sufficient width for two or more lines of vehicles moving lawfully" to travel side-by-side and that the motorcycle was traveling in the right lane as it approached the intersection.

{¶ 86} Officer Cornett testified that, even though Bellaire Road is not specifically marked as such, it is a double-lane road in each direction because the overall width of Bellaire Road, i.e., 39 feet, was wide enough for at least two lanes. He explained: "Depending on where you're at, a lane's going to be 8 to 10 feet. In this case[,] there's * * * just between 19 and 20 feet." He also noted that there are two traffic control signals for each primary direction on Bellaire Road. Rosa,

Lawrynce, Stokes and Larweh all testified that Bellaire Road is two lanes in each direction. The bus video shows vehicular travel in two lanes in each direction. Indeed, although Williams testified that either the Cleveland police or the GCRTA police told him that Bellaire Road is "one-lane on each side," he acknowledged that "it's wide enough for two cars to go through there."

{¶ 87} Appellants also contend that the motorcycle was unlawfully proceeding through the intersection because Jordan did not have a motorcycle endorsement to his driver's license and/or was operating the motorcycle at night, which was not permitted under a temporary motorcycle license. *See* R.C. 4510.12(A)(2). Even assuming this were true, whether or not Jordan had a valid motorcycle license arguably would not affect whether the motorcycle was "proceed[ing] * * * in a lawful manner" as it approached the intersection. By the terms of the statute, it is the "vehicle," not the driver, that must "proceed * * * in a lawful manner" in order for the vehicle to retain the right of way conferred on it by R.C. 4511.01(UU)(1) and R.C. 4511.42. *See* R.C. 4511.01(UU)(1) (defining "[r]ight-of-way" as "*[t]he right of a vehicle * * * to proceed uninterruptedly in a lawful manner* in the direction in which it * * * is moving in preference to another vehicle * * * approaching from a different direction into its * * * path") (Emphasis added.); *cf. Columbus v. Ellingen*, 10th Dist. Franklin No. 85AP-924, 1986 Ohio App. LEXIS 6219, 2-3 (Mar. 27, 1986) (rejecting contention, when interpreting Columbus City Code, that because driver did not possess a valid Ohio driver's license, the vehicle he was operating "was not in lawful use of the street," and concluding that phrase

"vehicular traffic in the lawful use of the street" refers to "the manner in which the vehicle is being operated, not the legal status of the driver of the vehicle"); *Holding v. Chappel*, 41 Ohio App.3d 250, 252, 535 N.E.2d 350 (9th Dist.1987) ("It is the vehicle, not the driver, that must move in a lawful manner in order for it to retain the right-of-way conferred on it."). *But see Noaker*, 2004-Ohio-2799, at ¶ 8 (driver who was driving with a prohibited concentration of alcohol forfeited his right of way).

{¶ 88} We need not resolve this issue here because even if the motorcycle was proceeding in an unlawful manner as it entered the intersection, a genuine issue of material fact would still exist as to Williams' negligence.

**Forfeiting Right of Way by Proceeding in an Unlawful Manner**

{¶ 89} Quoting *Deming v. Osinski*, 21 Ohio App.2d 89, 93, 255 N.E.2d 279 (11th Dist.1969), appellants assert that "[i]t is well settled Ohio law that 'a finding of negligence against the defendant necessitates finding of "lawful manner" on the part of the vehicle of the plaintiff'" and that Williams, therefore, could not be found be negligent if the motorcycle was proceeding in an unlawful manner. However, this quote is taken out of context.

{¶ 90} In *Deming*, the issue was whether the trial court had erred in charging the jury on contributory negligence by the plaintiff. *Id.* at 92-94. In that case, the defendant motor vehicle driver was making a left turn at an intersection on a green light. *Id.* at 90-91. The defendant claimed that, after entering the intersection, she looked and saw no one coming on the green light in the opposite direction, so she

proceeded with her left turn. When she turned left, her car collided with a motorcycle operated by the plaintiff. *Id.* at 91. The plaintiff had seen the defendant's vehicle with its left turn signal activated when it was approximately 500 feet ahead of him. He then looked to his left at a gas station. The next time he looked ahead, he saw the defendant's vehicle 20 or 30 feet ahead of him, executing its left turn across his lane of travel. When the plaintiff saw the defendant's vehicle turning into his lane of travel, the plaintiff braked in an attempt to avoid a collision but was unsuccessful. *Id.*

{¶ 91} At trial, the defendant admitted her negligence of "fail[ing] to yield the right of way" to the plaintiff's motorcycle when turning left at the intersection. *Id.* at 92-93. The trial court informed the jury that defendant had admitted she was negligent but also charged the jury on the issue of possible contributory negligence by the plaintiff. *Id.* at 92. The jury returned a verdict for the defendant, and the plaintiff appealed. *Id.*

{¶ 92} On appeal, the Eleventh District noted that the plaintiff's complaint had alleged that the defendant was negligent "in one regard only: failure to yield the right of way to lawfully proceeding traffic when making a left turn" and that, therefore, by admitting her negligence, the defendant "must have failed to yield the right of way" to the motorcycle. *Id.* at 92-93. The court held that by "admit[ting] that she was negligent in failing to yield the right of way" to the motorcycle, the defendant also necessarily admitted that the motorcycle was proceeding in a lawful manner because the motorcycle would have forfeited its right of way had it been

proceeding in an unlawful manner. *Id.* at 93. The Eleventh District reversed the trial court's judgment, reasoning that if the motorcycle was proceeding lawfully, the plaintiff could not have been contributorily negligent, and the trial court had, therefore, erred in instructing the jury on the possible contributory negligence of the plaintiff. *Id.* at 93-94.

{¶ 93} It was "[i]n such a case," i.e., where "the sole claim of negligence against the defendant is the failure to 'yield the right of way'" and the defendant admitted her negligence in failing to yield to the plaintiff's right of way, that the court held in *Deming* that "a finding of negligence against the defendant necessitates finding of 'lawful manner' on the part of the vehicle of the plaintiff." *Id.* The Ohio Supreme Court affirmed. *Deming v. Osinski*, 24 Ohio St.2d 179, 265 N.E.2d 554 (1970). The Eleventh District's decision in *Deming* did not specifically address what occurs when a vehicle with the preferential right of way forfeits that right of way by proceeding in an unlawful manner. *But see Deming*, 24 Ohio St.2d at 181-182, quoting *Morris*, 127 Ohio St. 147, 187 N.E. 2, at paragraph three of the syllabus.

{¶ 94} Where a vehicle forfeits its preferential status by proceeding in an unlawful manner, "both drivers would then be charged with the duty of exercising ordinary care." *Yarmoshik v. Parrino*, 8th Dist. Cuyahoga No. 87837, 2007-Ohio-79, ¶ 37, citing *Streetsboro v. Smith*, 11th Dist. Portage No. 93-P-0074, 1994 Ohio App. LEXIS 4966 (Nov. 4, 1994); *see also Maine v. Hawley*, 8th Dist. Cuyahoga No. 67835, 1995 Ohio App. LEXIS 3209, 7 (Aug. 3, 1995) ("The right of way is maintained if the person is proceeding in a lawful manner. If not, the preferential

status is lost and the obligations of the two vehicles are governed by the rules of common law."); *Noaker*, 2004-Ohio-2799, at ¶ 10 ("[T]he forfeiture of the preferential right-of-way merely results in the 'relative obligations of the drivers of the converging vehicles [being] governed by the rules of the common law.' * * * Each driver is still required to exercise ordinary care."), quoting *Morris* 127 Ohio St. 147, 187 N.E. 2, at paragraph three of the syllabus; *Sallie v. Baker*, 12th Dist. Preble No. CA94-12-029, 1995 Ohio App. LEXIS 5015, 7 (Nov. 13, 1995) (where driver violated statute and, therefore, "lost her right of way," "both parties were required to exercise ordinary care in the operation of their vehicles"); *cf. Koepke v. Metro. Property & Cas. Ins. Co.*, 2017-Ohio-4084, 92 N.E.3d 76, ¶ 17 (10th Dist.) ("If a driver loses his preferential status, then '[both parties] have "an equivalent obligation of exercising ordinary care.'"'"), quoting *Gagnet v. Downes*, 6th Dist. Lucas No. L-00-1282, 2001 Ohio App. LEXIS 4788, 13 (Oct. 26, 2001), quoting *State v. Ward*, 105 Ohio App. 1, 11, 150 N.E.2d 465 (3d Dist.1957). Under such circumstances, "[t]he determination of the parties' respective common law standards of care" are often "matters best determined by a jury." *Cropper v. Jewell*, 12th Dist. Clermont No. CA2008-09-088, 2009-Ohio-3683, ¶ 11.

{¶ 95} Accordingly, even if the motorcycle was proceeding in an unlawful manner, such that it forfeited its preferential right of way, this does not mean Williams owed no duty of care to Jordan or that he could not be found negligent. If the motorcycle was not proceeding in a lawful manner as it entered the intersection, it would then need to be determined whether one or both parties were negligent

"utilizing an ordinary care standard." *Yarmoshik* at ¶ 37. Ordinary care is the degree of care that an ordinarily reasonable and prudent person would exercise under the same or similar circumstances. *See, e.g., Mussivand v. David*, 45 Ohio St.3d 314, 318-319, 544 N.E.2d 265 (1989); *Sickles*, 196 Ohio App.3d 703, 2011-Ohio-6102, 965 N.E.2d 330, at ¶ 24. Based on the record before us, that would be an issue for determination by the jury.

{¶ 96} In this case, there is ample evidence in the record from which a reasonable jury could find that, even if the motorcycle was proceeding in an unlawful manner, Williams breached a duty of ordinary care when turning left at the intersection of Bellaire Road and Leeila Avenue. Anderson, Miller, Case and Williams all testified that GCRTA bus operators are trained that a bus operator must ensure that all oncoming lanes are clear before initiating a left turn and should not make a left turn if the bus operator cannot see "far enough down the road to turn safely" due to an obstruction or bright lights. Williams testified that when he moved into the intersection to initiate his left turn, he "couldn't see around the high beams" of the stopped vehicle and "couldn't get a sharp view on the right side" of the stopped vehicle. Nevertheless, in violation of the bus operator training he received and what Williams described as "common sense," he began turning left into the intersection and ultimately into the motorcycle's lane of travel. Williams testified that he did not see the motorcycle until it was side-by-side with the stopped vehicle. Although Williams stopped the bus before it collided with the motorcycle, a jury could reasonably find that this was "too little, too late," forcing Jordan to accelerate and/or

swerve to avoid impact with the bus, and that Williams' negligence was a cause of the accident and Jordan's injuries.

{¶ 97} Because genuine issues of material fact exist regarding whether an exception to the general rule of immunity applies based on Williams' alleged negligent operation of the bus, the trial court did not err in denying GCRTA's motion for summary judgment on grounds of political subdivision immunity. Accordingly, we affirm the trial court's decision to the extent it denies GCRTA's motion for summary judgment. Appellants' assignment of error is overruled with respect to GCRTA.

### Immunity of Employee of a Political Subdivision Under R.C. 2744.03(A)(6)

{¶ 98} Claims of immunity by an employee of a political subdivision are subject to a different analysis than claims of immunity by the political subdivision itself. The three-tiered analysis set forth above does not apply when determining whether an employee of a political subdivision is immune from liability for harm caused to another. Rather, R.C. 2744.03(A)(6) controls. *Cramer v. Auglaize Acres*, 113 Ohio St.3d 266, 2007-Ohio-1946, 865 N.E.2d 9, ¶ 17.

{¶ 99} Pursuant to R.C. 2744.03(A)(6), an employee of a political subdivision is immune from liability "[i]n a civil action * * * to recover damages for injury, death or loss to person or property allegedly caused by any act or omission in connection with a governmental or proprietary function" unless one of the following applies:

(a) The employee's acts or omissions were manifestly outside the scope of the employee's employment or official responsibilities;

(b) The employee's acts or omissions were with malicious purpose, in bad faith, or in a wanton or reckless manner; [or]

(c) Civil liability is expressly imposed upon the employee by a section of the Revised Code.

{¶ 100} Once again, there is no dispute that Williams is an employee of a political subdivision who was performing a proprietary function, subject to the general grant of immunity under R.C. 2744.03(A)(6). At issue here is the applicability of the exception to immunity set forth in R.C. 2744.03(A)(6)(b).

**Exception to Immunity for Wanton or Reckless Conduct Under R.C. 2744.03(A)(6)(b)**

{¶ 101} Appellee claims that Williams is not entitled to immunity because his conduct in operating the bus was both wanton and reckless.[9] Whether an employee acted in a wanton or reckless manner is generally a question of fact for the jury. *See Fabrey v. McDonald Village Police Dept.*, 70 Ohio St.3d 351, 356, 639 N.E.2d 31 (1994); *Gates*, 2016-Ohio-5627, 70 N.E.3d 1110, at ¶ 37 (8th Dist.); *Miller v. Hace*, 8th Dist. Cuyahoga No. 102500, 2015-Ohio-3591, ¶ 17; *Stevenson v. Prettyman*, 193 Ohio App.3d 234, 2011-Ohio-718, 951 N.E.2d 794, ¶ 43 (8th Dist.). Nevertheless, courts have not hesitated to find summary judgment appropriate where the facts, when construed in favor of the nonmoving party, fail to rise to the level of wanton or reckless conduct. *See, e.g., O'Toole v. Denihan*, 118 Ohio St.3d

---

[9] Appellee does not contend that Williams acted with malicious purpose or in bad faith.

374, 2008-Ohio-2574, 889 N.E.2d 505, ¶ 75 ("Although the determination of recklessness is typically within the province of the jury, the standard for showing recklessness is high, so summary judgment can be appropriate * * * where the individual's conduct does not demonstrate a disposition to perversity."); *Hoffman v. Gallia Cty. Sheriff's Office,* 4th Dist. Gallia No. 17CA2, 2017-Ohio-9192, ¶ 47 ("If reasonable minds could only conclude that the employee's conduct demonstrates, at most, negligence, then summary judgment is appropriate."). A trial court may not grant summary judgment to a political-subdivision employee on the grounds of R.C. 2744.03(A)(6) immunity unless, based on the evidence, reasonable minds could conclude only that the employee did not act in a wanton or reckless manner. If reasonable minds could disagree on this issue, then a trial court cannot properly grant an employee summary judgment based upon statutory immunity under R.C. 2744.03(A)(6). *Gates* at ¶ 37.

{¶ 102} "Wanton misconduct" is "the failure to exercise any care toward those to whom a duty of care is owed in circumstances in which there is great probability that harm will result." *Anderson v. Massillon*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266, ¶ 33; *see also Hawkins v. Ivy*, 50 Ohio St.2d 114, 363 N.E.2d 367 (1977), syllabus ("Where the driver of an automobile fails to exercise any care whatsoever toward those to whom he owes a duty of care, and his failure occurs under circumstances in which there is great probability that harm will result, such failure constitutes wanton misconduct.").

{¶ 103} "Reckless conduct" is "characterized by the conscious disregard of or indifference to a known or obvious risk of harm to another that is unreasonable under the circumstances and is substantially greater than negligent conduct." *Anderson* at ¶ 34. "The actor must be conscious that his conduct will in all probability result in injury." *O'Toole*, 118 Ohio St.3d 374, 2008-Ohio-2574, 889 N.E.2d 505, at paragraph three of the syllabus. In other words, there must be "'a perverse disregard of a known risk.'" *A.J.R. v. Lute*, Slip Opinion No. 2020-Ohio-5168, ¶ 17, quoting *O'Toole* at paragraph three of the syllabus.

{¶ 104} With respect to the difference between negligence and recklessness, the Ohio Supreme Court has cited "with approval" the following from the Second Restatement of Torts:

> Reckless misconduct differs from negligence in several important particulars. It differs from that form of negligence which consists in mere inadvertence, incompetence, unskillfulness, or a failure to take precautions to enable the actor adequately to cope with a possible or probable future emergency, in that reckless misconduct requires a conscious choice of a course of action, either with knowledge of the serious danger to others involved in it or with knowledge of facts which would disclose this danger to any reasonable man. It differs not only from the above-mentioned form of negligence, but also from that negligence which consists in intentionally doing an act with knowledge that it contains a risk of harm to others, in that the actor to be reckless must recognize that his conduct involves a risk substantially greater in amount than that which is necessary to make his conduct negligent. The difference between reckless misconduct and conduct involving only such a quantum of risk as is necessary to make it negligent is a difference in the degree of the risk, but this difference of degree is so marked as to amount substantially to a difference in kind.

*Marchetti v. Kalish*, 53 Ohio St.3d 95, 100, 559 N.E.2d 699 (1990), fn. 3, quoting 1 Restatement of Law 2d, Torts, Section 500, Comment g (1965); *see also Kurz v.*

*Great Parks of Hamilton Cty.*, 2016-Ohio-2909, 65 N.E.3d 96, ¶ 25-27 (snowplow operator who hit pedestrian when he swerved to avoid another snowplow was entitled to summary judgment on grounds of immunity under R.C. 2744.03(A)(6)(b) where evidence showed that, at most, operator "failed to take sufficient precautions" once the other snowplow's shifting maneuver made him aware of possible danger ahead, "present[ing] a jury question as to negligence, but "fail[ing] to rise to the level required for recklessness").

{¶ 105} The standard for establishing wanton or reckless conduct is "high" and requires consideration of the "totality of the circumstances." *See, e.g., Gates*, 2016-Ohio-5627, 70 N.E.3d 1110, ¶ 39; *Miller,* 2015-Ohio-3591, at ¶ 17; *Stevenson*, 193 Ohio App.3d 234, 2011-Ohio-718, 951 N.E.2d 794, at ¶ 43. As such, the determination of whether an employee acted in a wanton or reckless manner is highly dependent on the facts of each case.

{¶ 106} Even assuming that Williams had violated R.C. 4511.42(A) or C.C.O. 431.17 and even assuming he had acted contrary to the bus operator training he had received, this would not, in and of itself, constitute wanton or reckless conduct. As the Ohio Supreme Court explained in *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266:

> [I]t is well established that the violation of a statute, ordinance, or departmental policy enacted for the safety of the public is not per se willful, wanton, or reckless conduct, but may be relevant to determining the culpability of a course of conduct. * * *
>
> However, as the Restatement explains,

"In order that the breach of [a] statute constitute reckless disregard for the safety of those for whose protection it is enacted, the statute must not only be intentionally violated, but the precautions required must be such that their omission will be recognized as involving a high degree of probability that serious harm will result."

*Id.* at ¶ 37-38, quoting 2 Restatement of the Law 2d, Torts, Section 500, Comment e (1965).

{¶ 107} In support of his claim that he did not act wantonly or recklessly, Williams points to evidence that he initiated his left turn only after the opposing vehicle signaled for him to proceed, that "even then he turned slowly, with caution, keeping a lookout," and that he "stopped before either blocking the intersection or colliding with Jordan."

{¶ 108} In her opposition to Williams' motion for summary judgment (and her appellate brief) appellee asserts, generally, that "[g]iven the extreme and outrageous circumstances presented," a reasonable jury could find that Williams had acted recklessly or wantonly. She then cites a number of cases involving factually distinct scenarios in which courts have found that the facts could support a finding of reckless or wanton conduct. Appellee, however, does not indicate what it is, specifically, about Williams' conduct in operating the bus that she contends could meet the standards for reckless or wanton conduct. The only conduct appellee specifically argues could support an inference of wantonness or recklessness (which argument appears in a footnote) is Williams' failure to remain on the scene of the accident after passengers informed him that the motorcycle had crashed. By that time, multiple people were already at the scene, or were rushing to the scene, to

provide assistance to Jordan. Accordingly, under the particular facts and circumstances here, that conduct alone would not support a finding of wanton or reckless conduct.

{¶ 109} A jury could reasonably find that Williams made a serious error in judgment by initiating a left turn when he "couldn't see around the high beams" of the stopped vehicle and "couldn't get a sharp view on the right side" of the stopped vehicle. In doing so, he potentially violated both R.C. 4511.42(A) and the bus operator training he had received. A jury could also find that Williams exercised poor judgment by failing to remain at the scene until police arrived and, instead, proceeding with his route until directed to stop by transit police. However, the evidence shows that, when the light turned green, the bus initially waited for the stopped vehicle to proceed through the intersection. Only after the stopped vehicle signaled the bus and it was clear that the stopped vehicle was not going to proceed through the intersection, did the bus begin its left turn. The bus video confirmed that Williams proceeded with caution and further showed that Williams braked in sufficient time to avoid a collision with the motorcycle. Although the facts presented raise a jury question as to negligence, they fail to rise to the level of wantonness or recklessness.

{¶ 110} On the record before us, considering the totality of the circumstances and construing the evidence most strongly in appellee's favor, we conclude that a reasonable factfinder could not find that Williams operated the bus wantonly — i.e., that he failed to exercise *any care* toward Jordan under circumstances in which

there was great probability that harm would result — or recklessly — i.e., with *conscious disregard of or indifference to* a known or obvious risk of harm to Jordan that was unreasonable under the circumstances. *Anderson*, 134 Ohio St.3d 380, 2012-Ohio-5711, 983 N.E.2d 266 at ¶ 33-34.

{¶ 111} Although Williams met his initial burden on summary judgment, appellee failed to meet her reciprocal burden of putting forth evidence of specific facts demonstrating a genuine issue of fact regarding whether Williams' conduct in operating the bus was wanton or reckless. Accordingly, Williams is entitled to immunity under R.C. 2744.03(A)(6), and the trial court erred in denying Williams motion for summary judgment on immunity grounds. Appellants' assignment of error is sustained as to Williams.

{¶ 112} Appellants' assignment of error is sustained in part and overruled in part. The trial court properly denied GCRTA's motion for summary judgment on immunity grounds but erred in denying Williams' motion for summary judgment on immunity grounds.

{¶ 113} Judgment affirmed in part; reversed in part; remanded; cross-appeal dismissed.

{¶ 114} It is ordered that appellants/cross-appellees and appellee/cross-appellant shall share equally the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the Cuyahoga County Common Pleas Court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27
of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

ANITA LASTER MAYS, P.J., and
LISA B. FORBES, J., CONCUR